Certiorari Denied, August 4, 2015, No. 35,325

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2015-NMCA-082

Filing Date:  May 26, 2015

Docket No. 32,567

STATE OF NEW MEXICO,

 Plaintiff-Appellee,

v.

JOHNNY M. GUTIERREZ,

 Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY
Lisa C. Schultz, District Judge

Hector H. Balderas, Attorney General
Santa Fe, NM
Jane A. Bernstein, Assistant Attorney General
Albuquerque, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**VIGIL, Judge.**

{1} The district court judge in this case, on her own motion and without notice to Defendant or an opportunity to present evidence or argument on the question, reversed the prior determination of another district court judge that Defendant was not competent to stand trial, that it was unlikely he would attain competence in the future, and that he was

1

dangerous. We reverse and remand for civil commitment proceedings to be commenced.[1]

**BACKGROUND**

**{2}** Defendant was indicted in 2005 on twenty-three charges related to an incident in Las Cruces, wherein he and two other men trapped four adults and two children in a trailer and threatened them with firearms for several hours. Specifically, Defendant was charged with six counts of attempted first-degree murder, NMSA 1978, § 30-2-1(A)(2) (1994) and NMSA 1978, § 30-28-1 (1963); one count of conspiracy to commit first-degree murder, NMSA 1978, § 30-28-2 (1979) and § 30-2-1(A)(2); six counts of kidnapping with a firearm enhancement, NMSA 1978, § 30-4-1 (2003) and NMSA 1978, § 31-18-16 (1993); four counts of aggravated assault with a firearm enhancement, NMSA 1978, § 30-3-2(A) (1963) and § 31-18-16; four counts of aggravated battery, NMSA 1978, § 30-3-5(A) and (C) (1969); and two counts of intentional child abuse, NMSA 1978, § 30-6-1(D) (2009).

**{3}** After over two years of continuances, including those due to repeated changes in defense counsel, Defendant's attorney informed the district court that his client was unable to understand previous plea offers. A preliminary evaluation performed by Dr. Janette Castillo found that Defendant had an intelligence quotient (IQ) of sixty-two. As a result, defense counsel requested a hearing to determine whether Defendant was competent to accept a plea or to stand trial.

**{4}** Defendant then underwent a second evaluation at the State's request. Judge Douglas Driggers, who was then presiding over the case, held a determination of competency hearing in accordance with NMSA 1978, § 31-9-1.1 (1993) (1.1 hearing) on September 15, 2008, to determine whether Defendant was competent to stand trial. Judge Driggers concluded that Defendant was incompetent and dangerous, and ordered him committed to the New Mexico Behavioral Health Institute (NMBHI) in Las Vegas for treatment to attain competency, in accordance with NMSA 1978, § 31-9-1.2 (1999).

**{5}** In February 2009, Judge Driggers held a ninety-day review in accordance with NMSA 1978, § 31-9-1.3 (1999) (1.3 hearing) to assess Defendant's progress toward attaining competency and to review the reports from the NMBHI. The purpose of the hearing was to determine whether Defendant remained incompetent, whether he continued to be a danger to himself or others, and whether he could be treated to attain competency within nine months of being found incompetent. *Id.* Dr. Marianne Holman, Defendant's treatment

---

[1]Defendant also argues that the evidence is insufficient to support the convictions on three aggravated assault counts. Our disposition is without prejudice to Defendant raising this argument again in any future proceeding, should one be commenced against him in the future. NMSA 1978, Section 30-1-10 (1963) ("The defense of double jeopardy may not be waived and may be raised by the accused at any stage of a criminal prosecution, either before or after judgment.").

supervisor at the NMBHI, submitted a forensic report detailing her conclusions that Defendant was incompetent, dangerous, and unlikely to benefit from any further inpatient treatment due to the "severe and chronic" nature of his cognitive impairments. Based on her report and the hearing at which both parties stipulated to all three facts, Judge Driggers found Defendant was still incompetent, dangerous, and that he did not have a substantial probability of becoming competent. Dr. Holman had also provisionally diagnosed Defendant with mental retardation, and Judge Driggers granted Defendant's motion for a hearing to determine whether Defendant had mental retardation under NMSA 1978, § 31-9-1.6 (1999) (1.6 hearing).

**{6}** Defendant's case was reassigned to Judge Lisa Schultz on April 8, 2009. The State requested an independent evaluation of Defendant for mental retardation, which Judge Schultz granted in May 2009, and the hearing on whether Defendant had mental retardation occurred in November 2009. The expert testimony and argument at the hearing explicitly and exclusively centered on one issue: whether Defendant was a person with "mental retardation" as defined in Section 31-9-1.6(E).

**{7}** Despite the limited focus of the 1.6 hearing, Judge Schultz on her own motion, and without notice to the parties, took up the issue of competency once again and found that Defendant was competent to stand trial "beyond a reasonable doubt." Defendant moved for reconsideration, pointing out that the issue of competency had already been determined and stipulated to by the parties and that no competency evidence was presented at the hearing. Furthermore, Defendant emphasized, he had no notice or an opportunity to be heard on Defendant's competency, in violation of his right to due process. Judge Schultz denied the motion, and the case was placed on the docket for a jury trial, which occurred in May 2012. Defendant was found guilty of all twenty-three counts charged and sentenced to a prison term of 193 years.

**{8}** In her denial of Defendant's motion to reconsider, Judge Schultz stated that it would "shock the conscience" if she did not revisit the earlier competency ruling and limited herself to considering only whether Defendant had mental retardation. In her opinion, Defendant was "clearly competent."

**DISCUSSION**

**{9}** Both federal and New Mexico constitutional law have "long recognized that it is a violation of due process to prosecute a defendant who is incompetent to stand trial." *State v. Rotherham*, 1996-NMSC-048, ¶ 13, 122 N.M. 246, 923 P.2d 1131. To be considered competent, a defendant must (1) understand the nature and significance of the proceedings, (2) have a factual understanding of the charges, and (3) be able to assist in his own defense. *State v. Flores*, 2005-NMCA-135, ¶ 16, 138 N.M. 636, 124 P.3d 1175.

**{10}** Competency determinations such as this one implicate procedural due process rights: the United States Supreme Court has held specifically that a state court violates a

defendant's due process rights when it fails to inquire into competency after the defendant presents enough evidence to entitle him to a hearing on the issue. *Pate v. Robinson*, 383 U.S. 375, 385 (1966). Such a hearing cannot be dispensed with based on factors like the defendant's demeanor before the court but is, rather, a procedural right. *United States v. Cornejo-Sandoval*, 564 F.3d 1225, 1233 (10th Cir. 2009); *Pate*, 383 U.S. at 385. As such, it requires adequate notice, an adversarial hearing before an independent decision-maker, and a written statement from the fact finder clarifying the evidence relied upon and reasons for the decision. *Vitek v. Jones*, 445 U.S. 480, 494-95 (1980).

**{11}** Under New Mexico's statutory scheme, when a defendant's competence is at issue, he must be evaluated by a qualified professional, such as a psychologist or psychiatrist, whom the district court recognizes as an expert. Section 31-9-1.1. If, following a hearing and receipt of a written report from the expert evaluator, the district court determines that a defendant is not competent but is dangerous, the court may commit the defendant to a secure facility for treatment to attain competency. Section 31-9-1.2(B). Within ninety days, the district court must conduct a review hearing to assess whether a defendant remains incompetent and dangerous and whether he is responding to treatment. Section 31-9-1.3(A).

**{12}** If a defendant continues to be both incompetent and dangerous and does not respond to treatment, the district court conducts an evidentiary hearing in accordance with NMSA 1978, § 39-9-1.5 (1.5 hearing) in order to determine whether there is clear and convincing evidence that he is guilty of the accused crime. Section 31-9-1.5. If such evidence does exist, the defendant will be detained in a secure facility until either the "expiration of the period of time equal to the maximum sentence to which [he] would have been subject had [he] been convicted in a criminal proceeding" or the district court orders otherwise. Section 31-9-1.5(D)(2).

**{13}** At a defendant's request, the court may also conduct a 1.6 hearing to determine whether he has mental retardation. If it is determined that a defendant has mental retardation, civil commitment procedures will be initiated pursuant to NMSA 1978, § 43-1-1 (1999), and the criminal charges are dismissed. Section 31-9-1.6(D).

**{14}** In this case, Defendant presented sufficient evidence of incompetency to trigger his procedural due process rights, and Judge Driggers conducted an initial competency hearing on September 15, 2008. At that hearing, Defendant was required to show by a preponderance of the evidence that he was incompetent under the three-part incompetency test. *Flores*, 2005-NMCA-135, ¶ 16. Dr. Castillo performed an evaluation of Defendant on behalf of the court, and the State provided an independent evaluation from Dr. Marc Caplan. Both experts testified that Defendant was mildly mentally retarded. Dr. Caplan added that Defendant scored in the "clinically significant range of impairment" during testing.

**{15}** Dr. Castillo testified that, due to Defendant's low scores in verbal comprehension, he "would be unable to comprehend" any information shared with him verbally. This would make understanding in-court proceedings or documents with complicated legal language,

4

such as a plea agreement, "very difficult." Dr. Castillo also administered tests specific to competency evaluation, the Examination for Competency to Stand Trial, Revised (ECST-R) and the Revised Competency Assessment Instrument (RCAI). She observed that Defendant did not understand his current charges or the adversarial nature of the legal process and that he was overly reliant on his attorney because he was not able to assist in the planning of his defense. Based on her evaluation of Defendant, Dr. Castillo concluded that he was not competent.

**{16}** Dr. Caplan also administered tests specific to determinations of competency when conducting his evaluation, including the MacArthur Competence Assessment Tool, Criminal Adjudication (MacCAT-CA). His results generally mirrored Dr. Castillo's. He found that Defendant's factual understanding of the proceedings was flawed and that Defendant struggled to identify the roles of various people in the courtroom. He also found Defendant's ability to reason "marginal at best." Besides his low scores in intelligence and comprehension, Defendant had a previous neurological injury and mentioned suffering from hallucinations, for which he received medication. Dr. Caplan ultimately concluded that Defendant "sits on the line" between competence and incompetence.

**{17}** In addition to the expert testimony at the September 2008 hearing, Judge Driggers received written reports from both experts and heard testimony from two of Defendant's former lawyers. On the basis of the evidence presented, he found that Defendant was incompetent. Both parties stipulated, because of the severe nature of the charges, that Defendant was also dangerous. Therefore, in keeping with the procedure outlined in Section 31-9-1, Judge Driggers committed Defendant to the NMBHI for treatment and evaluation. Section 31-9-1.2.

**{18}** Generally, within ninety days of an incompetent defendant's detainment, his treatment supervisor must submit a written "progress report" detailing any advancements the defendant has made toward attaining competency, as well as whether he meets the criteria for dangerousness as defined in Section 31-9-1.2. Section 31-9-1.3. The district court then conducts a 1.3 hearing to determine whether the defendant remains incompetent and is not likely to become competent within nine months of the original finding of incompetency. Section 31-9-1.3(E).

**{19}** Defendant resided at the NMBHI for several months under the supervision of Dr. Holman and, in accordance with the statutory requirements, she provided a forensic report to Judge Driggers in February 2009. She included her determinations as to Defendant's competency and likelihood of becoming competent, based on several tests and the observations she and others at NMBHI had made of Defendant's behavior in the months during which he was detained there. She stated in her report: "It is my clinical opinion that, due to the severe and chronic nature of his impairment, [Defendant] will likely remain unable to attain competency to stand trial in the future." Dr. Holman also stated that "further inpatient treatment would be largely unproductive" because Defendant suffered considerable deficits in his memory, language ability, and the speed at which he processed new

5

information. She recommended that Defendant no longer receive such inpatient psychiatric treatment, as it would not aid him in attaining competency. The State did not contest Dr. Holman's conclusions at any time, and Judge Driggers ultimately agreed.

{20} On February 23, 2009, Judge Driggers conducted a 1.3 hearing on the issue. By that time, over five months had passed since Defendant was first found incompetent. At that hearing, both parties agreed to stipulate that Defendant was not competent, was dangerous, and that he was not likely to become competent. They acknowledged the department of health's recommendation that Defendant no longer required inpatient treatment at NMBHI, and agreed to hold a 1.5/1.6 hearing as a result of that recommendation. Judge Driggers issued an order reaffirming Defendant's incompetency and stating that "[t]here is not a substantial probability that . . . Defendant will become competent to proceed within one year of the date of the original finding of incompetency." (However, the statute requires only that a defendant demonstrate that there is not a substantial probability that he will regain competency within nine months. Section 31-9-1.3(E)).

{21} Determinations that a defendant will likely not regain competency are made by a preponderance of the evidence. Section 31-9-1.6(B). At the February 23, 2009 hearing on the matter, this burden was easily met; only Dr. Holman's forensic report addressed the issue, and both parties stipulated to their agreement with its conclusions.

{22} We now proceed to our discussion of: (1) procedural due process, (2) substantive due process, (3) proof of mental retardation, and (4) the proper remedy.

**Procedural Due Process**

{23} Whether Defendant was afforded procedural due process is a question subject to de novo review on appeal. *See State v. Dominguez*, 2008-NMCA-029, ¶ 5, 143 N.M. 549, 178 P.3d 834; *State ex rel. Children, Youth & Families Dep't v. Maria C.*, 2004-NMCA-083, ¶ 36, 136 N.M. 53, 94 P.3d 796.

{24} Procedural due process under both the United States Constitution and the New Mexico Constitution requires that a defendant be given reasonable notice and a fair opportunity to defend. *See State v. Baldonado*, 1998-NMCA-040, ¶ 21, 124 N.M. 745, 955 P.2d 214. *See also Rutherford v. City of Albuquerque*, 1992-NMSC-027, ¶ 7, 113 N.M. 573, 829 P.2d 652 ("The essence of procedural due process is that the parties be given notice and an opportunity for a hearing."). This includes a right to be heard in a meaningful manner, which "generally includes an opportunity to review and present evidence, confront and cross examine witnesses, and consult with counsel, either by way of an informal or formal hearing." *Maria C.*, 2004-NMCA-083, ¶ 26.

{25} In *Titus v. City of Albuquerque*, 2011-NMCA-038, ¶ 42, 149 N.M. 556, 252 P.3d 780, we stated that essential elements of the adversary process, some or all of which may be required as part of the due process afforded, include:

(1) adequate notice of the charges or basis for government action; (2) a neutral decision-maker; (3) an opportunity to make an oral presentation to the decision-maker; (4) an opportunity to present evidence or witnesses to the decision-maker; (5) a chance to confront and cross-examine witnesses or evidence to be used against the individual; (6) the right to have an attorney present the individual's case to the decision-maker; (7) a decision based on the record with a statement of reasons for the decision.

(quoting *Bd. of Educ. v. Harrell*, 1994-NMSC-096, ¶ 25, 118 N.M. 470, 882 P.2d 511). It is clearly evident that many of these constituent elements of procedural due process are absent in this case.

**{26}** The hearing held before Judge Schultz on November 17, 2009, was for the narrow purpose of determining mental retardation under Section 31-9-1.6. Both parties agreed that "the issue is not competency anymore. The issue is retardation." Under Section 31-9-1.6(E), " 'mental retardation' means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior. An intelligence quotient of seventy or below on a reliably administered intelligence quotient test shall be presumptive evidence of mental retardation." *Id.*; *see State v. Trujillo*, 2009-NMSC-012, ¶ 10, 146 N.M. 14, 206 P.3d 125 ("[T]here are two prongs to the New Mexico statutory definition of mental retardation: (1) significantly subaverage general intellectual functioning and (2) deficits in adaptive behavior.").

**{27}** The parties also agreed that Dr. Castillo and Dr. Siegel would both be qualified as experts "for the purposes of today's hearing with respect to the specific areas so mentioned": i.e., whether Defendant has mental retardation as defined by Section 31-9-1.6 and *Trujillo*. Neither the district court nor the parties attempted to qualify the witnesses as experts regarding competency, even though Dr. Castillo had been qualified as such in previous hearings.

**{28}** When it requested an evaluation for the 1.6 hearing, the State acknowledged that Defendant had already been evaluated for incompetence; then, at the NMBHI, he was evaluated for dangerousness and whether or not he was treatable; and finally the 1.6 hearing would determine whether Defendant had mental retardation or would instead require a 1.5 hearing for long-term criminal commitment. There was no testimony or argument as to any other issue at the 1.6 hearing.

**{29}** Following the 1.6 hearing, Judge Schultz ruled, on her own motion, without notice, and without any argument from the State, that Defendant had been proved competent "beyond a reasonable doubt." Defendant was denied his procedural right to effective and timely notice and the opportunity to present arguments and evidence before having a decision rendered against him. "[N]otice is essential to afford [a defendant] an opportunity to challenge the contemplated action and to understand the nature of what is happening to him." *Vitek*, 445 U.S. at 496.

7

**{30}** Moreover, Judge Schultz did not include—either in her original opinion or when she addressed Defendant's motion to reconsider—any findings of fact or conclusions of law that established an adequate basis for a ruling on competency. It contains no mention of any of the three factors for determining competency that a valid decision would require. Thus, in violation of Defendant's due process rights, the district court never provided Defendant with any justification for the district court's decision and the subsequent actions taken. *Wolff v. McDonnell*, 418 U.S. 539, 564 (1974).

**{31}** When Judge Driggers determined Defendant was incompetent following the September 2008 hearing, Defendant satisfied his burden of proving that he was incompetent. *See State v. Santillanes*, 1978-NMCA-051, ¶ 8, 91 N.M. 721, 580 P.2d 489 (stating that a defendant has the burden of proving his incompetence claim by a preponderance of the evidence). Judge Driggers reaffirmed the finding of Defendant's incompetency following the 1.3 hearing in February 2009. The burden therefore shifted to the State to prove that Defendant was competent to stand trial. *Santillanes*, 1978-NMCA-051, ¶ 10. However, Judge Schultz effectively required Defendant to re-prove his incompetence at the 1.6 hearing, without affording Defendant any opportunity to present evidence or argument. This was fundamental error. *Santillanes*, 1978-NMCA-051, ¶ 23 (stating that requiring a defendant to prove his competency a second time while the first determination of competency remains in effect constitutes fundamental error). The procedure Judge Schultz followed in ruling that Defendant was no longer incompetent violated fundamental precepts of due process and was essentially unfair. Her ruling cannot stand.

**Substantive Due Process**

**{32}** The prosecution of a defendant who is incompetent to stand trial violates due process. *Rotherham*, 1996-NMSC-048, ¶ 13. Again, under *Santillanes*, once Judge Driggers adjudicated Defendant incompetent to stand trial, the burden shifted to the State to prove that Defendant was competent. 1978-NMCA-051, ¶ 10. As we discuss more fully below, the State never introduced evidence to overcome the presumption, and in fact stipulated that Defendant was incompetent. Moreover, the evidence at the 1.6 hearing, which Judge Schultz relied on, was insufficient to overcome the presumption. Accordingly, Defendant's convictions must be set aside.

**{33}** The State never offered evidence to rebut the presumptions that Defendant was incompetent, dangerous, and unlikely to attain competency in the future; on the contrary, the State consistently expressed agreement with and even stipulated to those facts. Further, the only purpose of the 1.6 hearing, as we have already stated, was to determine if Defendant had mental retardation. In fact, prior to the hearing, the State specified that "[w]here we are is at the 1.5/1.6 part of the statutes in reference to [Defendant's] condition." The experts' testimony in the 1.6 hearing was thus strictly and deliberately limited.

**{34}** Dr. Siegel was never qualified as an expert in competency in any proceeding on this matter. When the State requested an independent evaluation from Dr. Siegel, it was

specifically and explicitly for the purposes of the 1.6 hearing, which the State described as "totally different" from competency hearings. The State argued that Dr. Siegel would be asked to evaluate Defendant based on the two-prong test set forth in *Trujillo*, an analysis specific to retardation. The State was granted an independent evaluation of Defendant from Dr. Siegel on these limited grounds, and Dr. Siegel testified at the 1.6 hearing that he believed the issue of competence had been settled prior to his involvement.

**{35}**    At the conclusion of Dr. Siegel's testimony, Judge Schultz asked him whether he was "saying that it's [his] opinion that [D]efendant is currently competent to stand trial[.]" He responded, "I am." This was the only question at the hearing regarding Defendant's competency, and it was irrelevant to the purpose of the hearing. Moreover, Dr. Siegel, who had not been qualified as an expert in competency at any time, did not elaborate on what foundation, if any, his opinion rested upon, and he was asked no follow-up questions about it.

**{36}**    Though Dr. Castillo had been qualified as an expert in competency at an earlier hearing, she offered no opinion and was asked no questions regarding Defendant's competency to stand trial. Instead, because the intelligence assessments showed that Defendant has an IQ below seventy, Dr. Castillo explicitly limited her testimony to whether Defendant exhibited deficits in adaptive behavior according to the Diagnostic and Statistical Manual of Mental Disorders (DSM).

**{37}**    The standards in our case law establish a clear difference in methods and standards for determining mental retardation as compared to competency. *See*, *e.g., Trujillo*, 2009-NMSC-012, ¶ 10 (setting forth a two-prong test for mental retardation); *Flores*, 2005-NMCA-135, ¶ 16 (setting forth a three-prong test for determining competency). Due to the specificity of the three-prong test for competency, competency evaluations are specialized instruments. For the earlier incompetency hearings, Defendant underwent a series of tests, three of which were specific to competency: ECST-R; RCAI; and the MacCAT-CA. No testimony was offered regarding any of the above tests at the 1.6 hearing due to the focus on mental retardation, which involved Defendant's IQ test and scores on the Vineland II assessment for adaptive behavior deficits.

**{38}**    The State neither offered testimony nor made any argument as to Defendant's competency to stand trial at the 1.6 hearing. Judge Schultz heard no testimony regarding competency from the experts at the 1.6 hearing with the exception of a single sentence from Dr. Siegel. In addition, while she received copies of certain written reports that included competency findings, Judge Schultz made no findings of fact on any of the three prongs of competency listed in *Flores*; in fact, she made no mention of those factors either directly or indirectly. Nonetheless, Judge Schultz concluded that Defendant "is competent to stand trial beyond a reasonable doubt."

**{39}**    We also note that at the close of the 1.6 hearing, Judge Schultz stated that, according to her interpretation of Section 31-9-1.6, she could make a determination regarding

Defendant's likelihood of attaining competency in the future. The State responded that only mental retardation had been argued at the hearing because the NMBHI report from Dr. Holman stated Defendant did not have a substantial probability of becoming competent. The defense agreed and added that IQ, the basis of the presumption of Defendant's mental retardation, was unlikely to improve: "When you have people like this with this number, there is nothing you can do to that particular number."

**{40}** Despite this apparent opportunity to revisit the issue, the State still provided no argument that Defendant was treatable to attain competency; on the contrary, it made clear that any evidence to that effect had not been and could not be presented without serious reconsideration: "I don't know if that might be reopened, and maybe [Defendant] could be reassessed for that back at Las Vegas [NMBHI] or by another clinician." As no such "reassessments" had been obtained, the only evidence on Defendant's likelihood of attaining competency continued to be the conclusions in the forensic report from Dr. Holman, to which both parties had stipulated. Dr. Holman's forensic report unambiguously determined that Defendant did not benefit from treatment and would remain incompetent due to the severe and chronic nature of his cognitive impairment.

**{41}** Judge Schultz did not make a specific ruling as to whether Defendant demonstrated a substantial probability of attaining competency. She also made no finding of fact as to whether Defendant had made progress from prior incompetency. In this case, the only evaluation of treatability came from Dr. Holman, who found him unlikely to benefit from any further treatment due to chronic impairment. The State neither argued nor presented evidence to suggest that Defendant had made or could make progress toward competency, and Judge Schultz heard no testimony on the matter before disregarding the prior ruling made by Judge Driggers that it was unlikely Defendant would attain competency in the future.

**{42}** The only testimony that Judge Schultz relied on was the testimony from the 1.6 hearing. However, that evidence was not offered by the State, nor was it sufficient to rebut the existing presumption that Defendant was incompetent to stand trial. The result is that Defendant remained incompetent, and his trial violated due process. Consequently, Defendant's convictions must be set aside for this additional reason.

**Proof of Mental Retardation**

**{43}** Judge Schultz made no finding regarding the evidence presented on whether Defendant has mental retardation because, as we have already discussed, she ruled that Defendant was competent to stand trial. We would ordinarily remand for a determination of this issue. However, because the facts are not in dispute, and the record is sufficient to make this determination as a matter of law, a remand is not necessary. Moreover, rulings on mental retardation under Section 31-9-1.6 are reviewed de novo. *Trujillo*, 2009-NMSC-012, ¶ 9. And a determination should be made as soon as possible about the propriety of Defendant serving a prison term in the penitentiary as opposed to treatment under a civil commitment.

10

*Id.*

**{44}** Section 31-9-1.6 defines what "mental retardation"means. Subsection (E) states:

> As used in this section, 'mental retardation' means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior. An intelligence quotient of seventy or below on a reliably administered intelligence quotient test shall be presumptive evidence of mental retardation.

As noted by our Supreme Court, the first sentence of the definition sets forth a two-prong test for the statutory definition of mental retardation: "(1) significantly subaverage general intellectual functioning and (2) deficits in adaptive behavior." *Trujillo*, 2009-NMSC-012, ¶ 10. However, under the explicit terms of the second sentence, a reliably administered IQ test resulting in an IQ of seventy or below "shall be presumptive evidence of mental retardation." Section 31-9-1.6(E). Therefore, an IQ test of seventy or below creates a statutory presumption that both prongs are satisfied, and the burden shifts to the State to prove by a preponderance of the evidence that a person does not have mental retardation. *See State v. Trujillo*, 2007-NMCA-056, ¶¶ 4, 21, 141 N.M. 668, 160 P.3d 577 (concluding that based on an IQ test score estimated to be in the high fifties to low sixties, there was a statutory presumption that the defendant had mental retardation, which the State failed to rebut), *aff'd*, 2009-NMSC-012, ¶ 13; *State v. Jones*, 1975-NMCA-078, ¶ 7, 88 N.M. 110, 537 P.2d 1006 (holding that "a true presumption shifts the burden of proof" (internal quotation marks and citation omitted)); Section 31-9-1.6(B) (stating that mental retardation must be proven by a preponderance of the evidence).

**{45}** The evidence on this question is undisputed and unrebutted. Defendant consistently scored below seventy on all his intelligence assessments over the course of a year and a half. One doctor found that Defendant has a full-scale IQ of sixty-two, and two others found Defendant to be in the "mild mental retardation" range with scores in the lowest percentile on verbal comprehension. Thus, we conclude that the evidence demonstrates that Defendant has mental retardation as a matter of law.

**The Proper Remedy**

**{46}** Defendant's convictions must be set aside because they were obtained in violation of his rights to procedural and substantive due process. Nevertheless, Defendant was adjudicated incompetent to stand trial; Defendant remains incompetent to stand trial and is unlikely to become competent; Defendant is dangerous; and Defendant has mental retardation. The question remains as to the proper disposition of the case.

**{47}** Our Supreme Court has held that criminal commitment cannot be applied to a defendant who meets the definition of mental retardation under Section 31-9-1.6. *Trujillo*, 2009-NMSC-012, ¶ 25. Once a defendant is found to have mental retardation, the statute

11

requires a department of health evaluation regarding whether the defendant poses a serious threat of harm to himself or others. Section 31-9-1.6(B). If the department of health finds that the defendant is dangerous, then Section 43-1-1 civil commitment proceedings must be commenced. Section 31-9-1.6(C); *Trujillo*, 2009-NMSC-012, ¶ 24 (extending the prohibition on criminal commitment to all defendants who are incompetent due to mental retardation, dangerous, and untreatable).

**{48}** The statutory requirements have therefore been satisfied and Section 43-1-1 civil commitment proceedings must follow. Section 31-9-1.6.

**CONCLUSION**

**{49}** For the above reasons, we reverse the district court's ruling as to competency and mental retardation and remand for further proceedings in keeping with this Opinion.

**{50}** **IT IS SO ORDERED.**

_____

**MICHAEL E. VIGIL, Chief Judge**

**WE CONCUR:**

_____

**CYNTHIA A. FRY, Judge**

_____

**J. MILES HANISEE, Judge**