**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2019-NMCA-042

Filing Date: May 20, 2019

No. A-1-CA-36643

STATE OF NEW MEXICO,

  Plaintiff-Appellee,

v.

JACOB F.,

  Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**T. Glenn Ellington, District Judge**

Released for Publication September 3, 2019.

Hector H. Balderas, Attorney General
Santa Fe, NM
Meryl E. Francolini, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**VARGAS, Judge.**

**{1}**  Defendant was arrested for aggravated battery after allegedly attacking his mother with a pair of garden shears. He appeals the district court's determination that he is not mentally retarded,[1] arguing that it erred in its application of NMSA 1978,

---

[1] Although our Supreme Court has acknowledged it is "no longer acceptable to describe individuals with developmental disabilities as 'mentally retarded[,]' " our statutes continue to use the term. *See State v. Linares*, 2017-NMSC-014, ¶ 1 n.1, 393 P.3d 691. In this opinion, we apply the language used by the Legislature, and, like the

Section 31-9-1.6 (1999). Because we conclude that the district court improperly placed the burden to demonstrate mental retardation on Defendant despite evidence sufficient to give rise to a statutory presumption that Defendant was mentally retarded, we reverse the district court's Section 31-9-1.6(E) determination and remand the matter to the district court. In light of this determination, we need not and do not consider Defendant's remaining arguments.[2]

## BACKGROUND

{2}     Following his arrest, Defendant's competency was immediately designated as an issue in the case, and the district court deemed Defendant both incompetent to stand trial and dangerous. Defendant moved for a hearing pursuant to Section 31-9-1.6 to determine whether he was mentally retarded and therefore subject only to civil commitment and not criminal prosecution. *See* § 31-9-1.6(D). Prior to the hearing, two IQ tests were administered to Defendant. Each of the doctors who separately administered the IQ tests testified that Defendant showed symptoms of psychosis during the testing process and each testified that Defendant scored below seventy on the IQ test he administered. Following the hearing, the district court issued an oral ruling, stating,

> First, is whether the defense has established by a reliably administered test that [Defendant] has a full scale IQ of less than seventy. The Court concludes they have not. . . . The question is whether the information received from him taking the test is reliable. The court concludes that . . . the information is not reliable. So, the presumptive level of a seventy test score has not been shown by a preponderance of the evidence to create the legal presumption. That being the case, . . . the State does not have to prove by a preponderance of evidence because the burden has not shifted as he is not . . . his intellectual disability and/or developmental delay in the modern vernacular, mental retardation as described under Section 31-9-1, that sequence has been met.

Of particular concern to the district court in making its determination was the unknown level of psychosis Defendant experienced during the tests and how any such psychosis might have impacted Defendant's scores. In the order resulting from the hearing, the district court reached two conclusions: (1) Defendant failed to establish, "based on a reliably administered intelligence quotient test[,]" that his IQ was at or below seventy, and (2) Defendant "failed to establish by a preponderance of the evidence that [he] was mentally retard[ed] as defined by [Section] 31-9-1.6(E)." Defendant appeals.

## DISCUSSION

---

Supreme Court in *Linares*, encourage our Legislature to amend the statutes in favor of more respectful terminology.

2Defendant also argues that the evidence was insufficient to support a conclusion that he committed one of the felonies giving rise to his detention, in violation of NMSA 1978, Section 31-9-1.5(D) (1999), and that the district court abused its discretion when it allowed the State to obtain a forensic evaluation of Defendant's competence.

**{3}**     Defendant argues on appeal that the district court erred when it concluded he was not mentally retarded pursuant to Section 31-9-1.6. Specifically, Defendant argues that the district court erroneously failed to shift the burden of proof to the State to rebut the presumption that Defendant is mentally retarded after two doctors testified that Defendant received a score below seventy on each of two IQ tests administered to him. We review the district court's determination that Defendant is not mentally retarded for an abuse of discretion. *See Linares*, 2017-NMSC-014, ¶¶ 23, 32.[3] "A district court abuses its discretion when it misapplies or misapprehends the law[,]" *State v. Pacheco*, 2008-NMCA-131, ¶ 34, 145 N.M. 40, 193 P.3d 587, or when its ruling is "against logic and is clearly untenable or not justified by reason[,]" *Linares*, 2017-NMSC-014, ¶ 24 (internal quotation marks and citation omitted). To the extent Defendant's appeal presents questions requiring statutory interpretation, those are questions of law that we review de novo. *Id.* ¶ 41.

**{4}**     "[M]ental retardation" is statutorily defined as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior." Section 31-9-1.6(E); *see Gutierrez*, 2015-NMCA-082, ¶ 44 (describing statutory definition as a "two-prong test"). An IQ of seventy or below on a "reliably administered" IQ test "shall be presumptive evidence of mental retardation[,]" and creates a statutory presumption that a defendant is mentally retarded. Section 31-9-1.6(E); *Gutierrez*, 2015-NMCA-082, ¶ 44 (internal quotation marks and citation omitted). Once this presumption is established, "the burden shifts to the [s]tate to prove by a preponderance of the evidence that a person does not have mental retardation." *Gutierrez*, 2015-NMCA-082, ¶ 44.

**{5}**     To claim entitlement to the statutory presumption of mental retardation, Defendant must show that he has an IQ of seventy or less and that the test used to determine that IQ was "reliably administered." The parties do not dispute that Defendant scored below seventy on the two IQ tests administered to him. The evidence presented at the hearing to determine whether Defendant is mentally retarded showed that Defendant underwent cognitive testing administered by two different doctors—Dr. Fields and Dr. Andrews. The testing revealed IQ scores of 67 and 68, respectively, scores which both doctors characterized as falling within the "extremely low range."

**{6}**     While the parties agree that Defendant scored below seventy on the IQ tests, they disagree as to whether the IQ tests were "reliably administered," as required by Section 31-9-1.6(E). The State, urging a broad interpretation of the statute, argues that the language of Section 31-9-1.6(E) requiring the IQ test to be "reliably administered"

---

3Defendant contends, and the State concedes, that the applicable standard of review is de novo, but we find the parties' citations in support of their shared view unpersuasive. Defendant cites to *State v. Office of Public Defender ex rel. Muqqddin*, 2012-NMSC-029, 285 P.3d 622, which involves no competency issues at all, and instead relies on principles of statutory construction in resolving a burglary-related question. The State cites to a Section 31-9-1.6 case from this Court, *State v. Gutierrez*, 2015-NMCA-082, 355 P.3d 93, but in doing so ignores the fact that our Supreme Court has subsequently applied an abuse of discretion standard in reviewing a mental retardation determination. We are bound by precedent set by our Supreme Court, *see State ex rel. Martinez v. City of Las Vegas*, 2004-NMSC-009, ¶ 22, 135 N.M. 375, 89 P.3d 47 (reiterating principle that Court of Appeals is bound by Supreme Court precedent).

requires proof that the test results themselves are reliable in order to trigger the statutory presumption and that Defendant's psychosis prevented the doctors from obtaining accurate results when they administered their IQ tests to Defendant. According to the State, a strict construction of the statutory language—one limiting the relevant inquiry to the reliability of the administration of the IQ test without requiring accuracy in the result—would run counter to legislative intent and render the "reliably administered" test requirement "useless and superfluous." By contrast, Defendant contends that the Legislature's use of the term "reliably administered" IQ test unambiguously refers to the reliability of the test's administration, not the reliability of its results, noting that to "administer" a test is to "manage or supervise [its] execution[.]" We conclude that Defendant's straightforward reading of the statute must control.

**{7}** When interpreting a statute, we seek to effectuate the Legislature's intent, which we discern from the language of the statute. *See State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352; *State v. Nieto*, 2013-NMCA-065, ¶ 4, 303 P.3d 855. Our interpretation may encompass no more than applying the language of the statute as written:

> [I]f the meaning of a statute is truly clear—not vague, uncertain, ambiguous, or otherwise doubtful—it is of course the responsibility of the judiciary to apply the statute as written and not to second-guess the [L]egislature's selection from among competing policies or adoption of one of perhaps several ways of effectuating a particular legislative objective.

*Helman*, 1994-NMSC-023, ¶ 22.

**{8}** As we consider the Legislature's intent in requiring a "reliably administered" IQ test as presumptive evidence of mental retardation, we note that each of the testifying doctors in this case provided a similar definition of what constitutes a "reliably administered" test. Dr. Fields testified that a "reliably administered" test referred to an evaluator's ability to administer the test in a way that a person's performance on that test would remain the same over time, even if tested by different examiners. Dr. Andrews described a "reliably administered" test as one that is well validated and widely accepted among practitioners in the field, that the person administering the test would have experience administering and evaluating the test, and that the test would yield consistent results.

**{9}** In this instance, neither doctor questioned the efficacy or acceptance of the test used by the other to determine Defendant's IQ, nor did either doctor challenge the methods employed or procedures followed by the other in implementing the tests. Both doctors were experienced in administering and evaluating IQ tests. With regard to the testimony of both doctors that a "reliably administered" test would necessarily yield consistent results, Dr. Fields testified that Defendant's score of 62 on a previously administered IQ test, as well as Defendant's scores of 67 and 68 on the tests he and Dr. Andrews administered, suggested reliability. Dr. Fields opined that the scores were indicative of Defendant's consistent performance at the extremely low range and that

future testing would produce scores in a similar range. Dr. Andrews, by contrast, testified that while there appeared to be some "surface" consistency in the IQ scores, the subtests administered to Defendant indicated some significant differences in his performance, suggesting a lack of ability to perform consistently across time due to Defendant's psychotic symptoms. According to Dr. Andrews, these differences in performance in the subtests call into question the accuracy of Defendant's IQ scores of 67 and 68.

**{10}**    Having considered the language of the statute and the testimony of the doctors, we agree with Defendant that the legislative requirement of a "reliably administered" IQ test is directed at the manner in which the test is given to the subject, rather than the accuracy of the results reached. The State fails to point to any language in the statute to support its contention that the statute requires a defendant to prove the accuracy of the IQ test results before he or she is entitled to a presumption of mental retardation. For one to be presumed mentally retarded, the plain language of Section 31-9-1.6(E) unambiguously requires nothing more than a showing of a "reliably administered" test that results in a score of seventy or less. Common usage makes clear that the phrase "reliably administered test" addresses the manner in which the test is given and not the accuracy of the results, and there is nothing in the statute to suggest that the two concepts should be viewed as synonymous with one another. *See* NMSA 1978, § 12-2A-2 (1997) ("Unless a word or phrase is defined in the statute or rule being construed, its meaning is determined by its context, the rules of grammar and common usage."). "We will not read into a statute any words that are not there, particularly when the statute is complete and makes sense as written." *State v. Trujillo*, 2009-NMSC-012, ¶ 11, 146 N.M. 14, 206 P.3d 125.

**{11}**    Furthermore, nothing in the language of the statute raises any "genuine uncertainty as to what the [L]egislature was trying to accomplish" that might necessitate further interpretation beyond the statute's plain language. *Helman*, 1994-NMSC-023, ¶ 23. The plain language of Section 31-9-1.6(E) states, in no uncertain terms, that "[a]n [IQ] of seventy or below on a reliably administered [IQ] test *shall* be presumptive evidence of mental retardation." Section 31-9-1.6(E) (emphasis added). " 'Shall' will be given its mandatory meaning, unless there are indications in the statute that the mandatory reading is repugnant to the manifest intent of the Legislature." *Tomlinson v. State*, 1982-NMSC-074, ¶ 9, 98 N.M. 213, 647 P.2d 415; *see Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 22, 146 N.M. 24, 206 P.3d 135 ("It is widely accepted that when construing statutes, 'shall' indicates that the provision is mandatory, and we must assume that the Legislature intended the provision to be mandatory absent a clear indication to the contrary."). In furtherance of our constitutional prohibition against prosecuting mentally retarded defendants, *see State v. Rotherham*, 1996-NMSC-048, ¶ 13, 122 N.M. 246, 923 P.2d 1131, the Legislature clearly intended to establish a statutory scheme that set a quantifiable standard to guide courts as they evaluate defendants for mental retardation—a defendant with an IQ of seventy or below is presumed to be mentally retarded.

**{12}** Importantly, the remaining provisions of Section 31-9-1.6 make clear the Legislature's intent to extend the inquiry into a defendant's mental retardation beyond the presumption-creating stage of the proceedings, as an IQ score of seventy or below does not end the court's inquiry, but merely gives rise to a rebuttable presumption of mental retardation. In the event the state has concerns about the accuracy of a given IQ test, it retains the opportunity to demonstrate that inaccuracy in seeking to overcome the presumption of mental retardation by a preponderance of the evidence. *See Gutierrez*, 2015-NMCA-082, ¶ 44. Thus, the State's argument addressing the accuracy of Defendant's IQ test results is more properly explored during the State's rebuttal, when the level of Defendant's general intellectual functioning will ultimately be determined.

**{13}** Our decision that a defendant need not prove the accuracy of IQ test results to be entitled to a presumption of mental retardation is not to say that the accuracy of the results of such tests are not affected by the method or manner of their administration. Obviously, a "reliably administered" test is more likely to yield an accurate result than a test that is not "reliably administered." Nonetheless, at the "presumption" stage of the mental retardation analysis, the Legislature has made clear that nothing more is required than that the test be "reliably administered."

**{14}** Having determined that Defendant is not required to prove the accuracy of the testing results, but only that the testing was "reliably administered" to be entitled to a presumption of mental retardation, we consider the evidence presented at the Section 31-9-1.6 hearing below. As indicated, neither doctor questioned the efficacy or acceptance of the IQ tests used to evaluate Defendant or the underlying methods employed during the testing process. Furthermore, the doctors' ultimate findings as to the numerical values of Defendant's IQ scores were separated by only a single point, with one scoring Defendant's IQ at 67 and the other scoring it at 68, indicating consistency in results. The State presented nothing to suggest that the test each doctor administered to Defendant was unreliably administered, pointing instead to a perceived inaccuracy in the testing results that it attributes to Defendant's psychosis—a cause Dr. Fields testified was unrelated to the "reliable administration" of the tests. Because the testimony presented at the hearing to determine whether Defendant was mentally retarded was sufficient to support a conclusion that Defendant's IQ tests were "reliably administered," the district court was required to presume that Defendant was mentally retarded based on his IQ scores of 67 and 68.

**{15}** We conclude that the district court misapplied Section 31-9-1.6(E), that Defendant is entitled to a presumption that he is mentally retarded, and that the district court improperly placed the burden on Defendant to prove mental retardation. We therefore remand for such further proceedings as may be necessary to allow the district court to determine whether the State met its burden of proving by a preponderance of the evidence that Defendant was not mentally retarded, either by establishing that Defendant does not have significantly subaverage general intellectual functioning or that he does not have deficits in his adaptive behavior, or both. Based on this disposition, it is unnecessary for us to address the other arguments raised by Defendant.

**CONCLUSION**

**{16}**   We reverse and remand for further proceedings consistent with this opinion.

**{17}   IT IS SO ORDERED.**

**JULIE J. VARGAS, Judge**

**WE CONCUR:**

**M. MONICA ZAMORA, Chief Judge**

**BRIANA H. ZAMORA, Judge**