## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2009-NMSC-012**

**Filing Date: February 26, 2009**

**Docket No. 30,318**

**STATE OF NEW MEXICO,**

      **Plaintiff-Petitioner,**

**v.**

**DANIEL BEN TRUJILLO,**

      **Defendant-Respondent.**


**ORIGINAL PROCEEDING ON CERTIORARI**
**Ross C. Sanchez, District Judge**


Gary K. King, Attorney General
Anita Carlson, Assistant Attorney General
Santa Fe, NM

for Petitioner

Hugh W. Dangler, Chief Public Defender
JK Theodosia Johnson, Assistant Appellate Defender
Marc A. Gordon, Assistant Public Defender
Santa Fe, NM

for Respondent


Jones, Snead, Wertheim & Wentworth, P.A.
Jerry Todd Wertheim
Santa Fe, NM

Barbara E. Bergman
Albuquerque, NM

1

Trace L. Rabern
Santa Fe, NM

for Amicus Curiae
New Mexico Criminal Defense Lawyers Association

**OPINION**

**SERNA, Justice.**

**{1}** We are faced with the unenviable task of interpreting the statutory labyrinth created by the intersection of the New Mexico Mental Illness and Competency Code ("NMMIC"), NMSA 1978, §§ 31-9-1 to -1.5 (1988), NMSA 1978, Section 31-9-1.6 (1997, as amended through 1999), and the Mental Health and Developmental Disabilities Code ("MHDDC"), NMSA 1978, §§ 43-1-1 to -25 (1976). First, we are asked whether the definition of mental retardation in Section 31-9-1.6 tracks that of the Diagnostic and Statistical Manual of Mental Disorders. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders-IV-TR* 41 (2000) ("DSM"). We hold that the New Mexico definition of mental retardation in Section 31-9-1.6 is not equivalent to that of the DSM in that it does not contain an age of onset requirement.

**{2}** Second, we consider whether defendants with mental retardation who are dangerous, incompetent, and without a substantial probability of gaining competence may be criminally committed per the NMMIC or whether Section 31-9-1.6 precludes such commitment. We hold that Section 31-9-1.6 mandates that defendants with mental retardation who are dangerous, incompetent, and without a substantial probability of gaining competence may not be criminally committed, though they may be civilly committed at the discretion of the district court and the district attorney. We therefore affirm the Court of Appeals.

**I. FACTS AND PROCEEDINGS BELOW**

**{3}** Defendant, Daniel Ben Trujillo, stands accused of attempted first degree murder, aggravated burglary, aggravated battery, and tampering with evidence. The State alleges that he broke into the home of his employer and tried to kill him with a steel bar because of allegations that the employer had raped Defendant's girlfriend. Defendant has an extreme mental condition resulting from self-inflicted carbon monoxide poisoning that occurred over twenty years ago when Defendant was twenty-six years old. As a result of this suicide attempt, Defendant's IQ is estimated to be in the high fifties to low sixties. This score puts him in the first percentile, meaning that ninety-nine per cent of the population has a higher IQ than he does.

**{4}** Upon a pretrial defense motion to determine competency, the district court stayed Defendant's trial and ordered him to undergo a psychological evaluation. Defendant was examined by Dr. Eric Mason Westfried, a clinical psychologist, who determined that

2

Defendant was incompetent to stand trial. Both parties stipulated to Dr. Westfried's evaluation and the district court entered a finding that Defendant was incompetent to stand trial.

**{5}** The defense subsequently filed a notice of mental retardation, whereupon a hearing was held and the district court ordered Defendant committed for a determination of competency based on mental retardation. A second clinical psychologist, Dr. Renee H. Wilkins, again found that Defendant was incompetent and unlikely to be treated to competency. This expert further found that Defendant was dangerous. However, Dr. Wilkins reported that Defendant did not meet the medical or psychiatric definition of mental retardation for the sole reason that his difficulties did not commence prior to his attaining the age of eighteen, as required by the DSM. *See* DSM at 41. Rather, Dr. Wilkins diagnosed Defendant with dementia, a dysfunction that has a medical definition comparable to mental retardation but without the age of onset requirement.

**{6}** Despite Dr. Wilkins' failure to diagnose Defendant with mental retardation, the district court found that Defendant had mental retardation per the definition in Section 31-9-1.6(E). The district court issued factual findings to the effect that Defendant is dangerous, incompetent, and without a substantial probability of gaining competence pursuant to Section 31-9-1.6(B). The court determined that, because Defendant was not charged with one of the enumerated crimes in Section 31-9-1.6(C), he was not subject to civil commitment by the Department of Health ("DOH") under the MHDDC. *See* § 31-9-1.6(C) ("[T]he [DOH] shall commence [civil commitment] if the defendant was charged with murder in the first degree, first degree criminal sexual penetration, criminal sexual contact of a minor or arson."); § 43-1-1 to -25. Instead, the district court concluded, because he was not accused of any of the felonies enumerated in Section 31-9-1.6(C), Defendant could only be criminally committed under the NMMIC. *See* § 31-9-1 to -1.5; § 31-9-1.6(C).

**{7}** Because of the "substantial ground for difference of opinion" regarding the correct interpretation of Section 31-9-1.6, the district court granted Defendant leave to file an application for interlocutory appeal to the Court of Appeals. *See* Rule 12-203 NMRA (outlining the procedure for interlocutory appeals). In a published opinion, the Court of Appeals affirmed in part and reversed in part. *See State v. Trujillo*, 2007-NMCA-056, ¶ 3, 141 N.M. 668, 160 P.3d 577. It upheld the district court's determination that Defendant has mental retardation. *See id.* However, in a split opinion, it reversed the district court's order allowing Defendant to be criminally committed under the NMMIC. *See id.* ¶ 24. The majority held that, while before the enactment of Section 31-9-1.6, the NMMIC applied to all incompetent defendants, Section 31-9-1.6 operated as a special carve-out for those defendants who are incompetent due to mental retardation. *See id.* ¶ 25. Thus, it held, in enacting Section 31-9-1.6, the Legislature created a distinct procedure for defendants who have been found incompetent due to mental retardation and precluded criminal commitment for such defendants under the NMMIC. *See id.* ¶¶ 25, 26. However, the Court of Appeals also held that the district court could still detain Defendant by referring the matter to the district attorney for civil commitment proceedings under the MHDDC. *Id.* ¶ 32; *see* § 43-1-

3

1(E).

**{8}** The Court of Appeals' dissent concluded that, rather than supplanting the NMMIC for mentally retarded defendants, Section 31-9-1.6 only supplements those sections. *Trujillo*, 2007-NMCA-056, ¶ 40 (Wechsler, J., dissenting). The dissent pointed out that the Legislature did not explicitly amend the NMMIC so that it no longer applied to defendants with mental retardation. *Id.* ¶ 41. Further, the dissent reasoned that Section 31-9-1.6 is not itself a comprehensive scheme for dealing with incompetent mentally retarded defendants; it does not include the procedural guarantees included in the NMMIC such as a method for transfer to the district court, a hearing to ensure sufficient evidence of guilt, or periodic review of a defendant's case. *Id.* ¶¶ 42-43; *see* §§ 31-9-1 to -1.3. Finally, the dissent also thought it problematic that Section 31-9-1.6 would be interpreted to withdraw all defendants incompetent due to mental retardation from the NMMIC regime while only explicitly providing a resolution for a sub-category of those individuals: namely, those who are dangerous, incompetent, without a substantial probability of gaining competence, and accused of one of the listed felonies. *Id.*; *see* § 31-9-1.6©.

**{9}** We granted certiorari on two issues: whether the Court of Appeals erred in determining that Defendant has mental retardation under New Mexico law and whether it erred in holding that he may not be criminally committed under the NMMIC. Both of these questions involve statutory interpretation, which is a matter of law and is reviewed de novo. *State v. Rivera*, 2004-NMSC-001, ¶ 9, 134 N.M. 768, 82 P.3d 939. We address each issue in turn.

## II.    DISCUSSION

### A.    Defendant Has Mental Retardation Under New Mexico Law
B.
**{10}** Mental retardation is defined by Section 31-9-1.6(E) as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior." Thus, there are two prongs to the New Mexico statutory definition of mental retardation: (1) significantly subaverage general intellectual functioning and (2) deficits in adaptive behavior. This language closely tracks the definition of mental retardation found in the DSM but the DSM adds a third prong. *See* DSM at 41. Under the DSM, one's symptoms must have begun before age eighteen in order to be classified as mental retardation. *Id.* The State urges us to read in the age of onset requirement so that the definition in Section 31-9-1.6 would mirror the DSM definition. Under this formulation, Defendant, whose disorder did not begin until his mid-twenties, would not be classified as having mental retardation.

**{11}** In interpreting a statute, our primary objective is to give effect to the Legislature's intent. *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064. In discerning legislative intent, we look first to the language used and the plain meaning of that language. *Id.* Under the plain meaning rule, when a statute contains clear and unambiguous language, we will heed that language and refrain from further statutory interpretation. *State v. Rivera*,

4

2004-NMSC-001, ¶ 10. We will not read into a statute any words that are not there, particularly when the statute is complete and makes sense as written. *Burroughs v. Bd. of County Comm'rs of Bernalillo County*, 88 N.M. 303, 306, 540 P.2d 233, 236 (1975).

{12}    Because the language used in Section 31-9-1.6(E) to define mental retardation is strikingly similar to that of the DSM, we can infer that the Legislature was aware of the DSM definition, and the critical third prong, and declined to adopt it. The Legislature's decision to exclude the age of onset factor is logical given that what is legally relevant are the symptoms probative of culpability at the time of the alleged crime and coherence at the time of trial, not the age at which those symptoms started to affect the individual.

{13}    To be sure, we have previously recognized the differing purposes of the legal and medical definitions of insanity: "through the legal definition, the law seeks to assess accountability, whereas psychiatry's purpose is to diagnose and cure mental illnesses." *State v. Neely*, 112 N.M. 702, 707, 819 P.2d 249, 254 (1991) (internal quotation marks and citation omitted). Even the DSM itself warns of the "significant risks" of importing its categories and criteria to the legal setting: "dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis." DSM at xxxii-xxxiii. Because the Legislature's omission of the age of onset requirement is clear and unambiguous and, further, because the age of onset of one's symptoms is not legally relevant, we affirm the Court of Appeals and hold that the New Mexico statutory definition of mental retardation does not contain such a requirement. *See Rivera*, 2004-NMSC-001, ¶ 10. Defendant has mental retardation under New Mexico law. We now turn to the more opaque issue: what the State may do when faced with a defendant who is dangerous, incompetent due to mental retardation, and without a substantial probability of gaining competence.

**B.    Defendant May Not be Criminally Committed**

**1.    Background**

{14}    At the heart of the matter presented is the intended relationship between the NMMIC and Section 31-9-1.6. The NMMIC was enacted in 1988 in response to *Jackson v. Indiana*, in which the United States Supreme Court held that indefinite commitment of a defendant based solely on his incompetency to stand trial violated due process and equal protection. *State v. Gallegos*, 111 N.M. 110, 114, 802 P.2d 15, 19 (Ct. App. 1990); *see Jackson v. Indiana*, 406 U.S. 715, 729-30, 731 (1972). The NMMIC instituted a comprehensive system for processing incompetent defendants through the criminal justice system in New Mexico.

{15}    The purposes of the NMMIC are to provide for: (1) dismissal of the charges when the State cannot prove its case, thereby eliminating the prospect of an indeterminate detention on meritless charges; (2) confinement of dangerous, incompetent defendants; and (3) "an orderly and progressive method of evaluating and treating defendants who can be returned to competency within a reasonable amount of time and a fair method of detaining

5

incompetent, dangerous defendants who cannot." *Gallegos*, 111 N.M. at 114-15, 802 P.2d at 19-20.

**{16}** Section 31-9-1.6 was enacted nearly ten years subsequent to the NMMIC. Its scope and procedural guarantees are much narrower than the NMMIC; it is virtually skeletal in comparison. It applies to a discrete group of incompetent defendants, those who are incompetent because they have mental retardation. *See* § 31-9-1.6(B).

**{17}** As pertinent here, Section 31-9-1.6 provides that, if a court finds, by a preponderance of the evidence, that an incompetent defendant has mental retardation and does not have a substantial probability of becoming competent, the DOH shall evaluate the defendant for dangerousness. Section 31-9-1.6(B). It continues,

[i]f the [DOH] evaluation results in a finding that the defendant presents a likelihood of serious harm to himself or a likelihood of serious harm to others, within sixty days of the [DOH]'s evaluation the [DOH] shall commence proceedings pursuant to [the MHDDC] *if the defendant was charged with* murder in the first degree, first degree criminal sexual penetration, criminal sexual contact of a minor or arson in the initial proceedings . . . .

Section 31-9-1.6(C) (emphasis added). The final relevant subsection requires dismissal of the charges after the civil commitment hearing or fourteen months after the initial determination of incompetence. *See* § 31-9-1.6(D).

**{18}** Thus, while the statute requires civil commitment for those defendants who are dangerous, incompetent due to mental retardation, without a substantial probability of gaining competence, and accused of one of the four enumerated crimes, it does not speak explicitly to the outcome for defendants who are dangerous, incompetent due to mental retardation, without a substantial probability of gaining competence, and *not accused* of one of the four enumerated crimes. This is the predicament in which we find ourselves: the plain language of Section 31-9-1.6 provides no explicit indication of what the Legislature intended regarding individuals such as Defendant.

**{19}** The State advocates that Defendant must be criminally committed. Its argument basically proceeds on four grounds: the plain language of Section 31-9-1.6 does not contemplate the civil commitment of Defendant; the 1999 amendment to Section 31-9-1.6 nullified the authority the State had to civilly commit Defendant under that section; there is no authority in the MHDDC to civilly commit Defendant, absent initiation of proceedings by a guardian; and civil commitment is inadequate to ensure the public safety.

**{20}** Defendant and amicus New Mexico Criminal Defense Lawyers Association maintain that Section 31-9-1.6 precludes Defendant from being criminally committed and that he may only be civilly committed. They maintain, *inter alia*, that requiring Defendant to be criminally committed would lead to an absurd result; that Section 31-9-1.6 was enacted to treat incompetent people with mental retardation differently than those with mental illness;

6

and that cycling permanently incompetent people with mental retardation through the NMMIC's criminal commitment and review cycle is unwise and unconstitutional.

**{21}**     Our ultimate goal in statutory construction is to "ascertain and give effect to the intent of the Legislature." *State v. Cleve*, 1999-NMSC-017, ¶ 8, 127 N.M. 240, 980 P.2d 23. Though we begin our inquiry into legislative intent with the plain meaning of the language, such plain meaning does not trump common sense.  Rather, if the language is "doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity or contradiction," *Davis*, 2003-NMSC-022, ¶ 6, we will reject the plain meaning in favor of an interpretation driven by the statute's "obvious spirit or reason." *Id.*  Thus, we are not bound by a "formalistic and mechanical statutory construction when the results would be absurd, unreasonable, or contrary to the spirit of the statute." *State v. Smith*, 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022.

**{22}**   In addition to looking at the language, we also consider the statute's history, background, and function in the comprehensive legislative scheme.  *Id.* (internal quotation marks and citation omitted).  A statute or subsection need not be considered independently or "in a vacuum," but alongside statutes dealing with the same subject matter.  *Id.* (internal quotation marks and citation omitted).   "Whenever possible, . . .  we must read different legislative enactments as harmonious instead of as contradicting one another."  *State v. Muniz*, 2003-NMSC-021, ¶ 14, 134 N.M. 152, 74 P.3d 86 (internal quotation marks and citation omitted).

## 2.      A Mechanical Application of Section 31-9-1.6 Leads to an Absurd and Unreasonable Result

**{23}**   The State argues that Defendant must be criminally committed because Section 31-9-1.6 does not explicitly require that he be civilly committed.  It contends that, in the absence of a clear statutory directive to the contrary, the previous regime, criminal commitment under the NMMIC, should remain in place.

**{24}**   However, interpreting Section 31-9-1.6 to require the criminal commitment of defendants who are dangerous, incompetent because of mental retardation, without a substantial probability of gaining competence, and accused of a crime other than those enumerated leads to an absurd and inequitable result.  Namely, defendants incompetent due to mental retardation who are charged with one of the four felonies enumerated in Section 31-9-1.6(C) would automatically be civilly committed under that subsection while those who are charged with any other less serious crime would continue to be subject to criminal commitment under the NMMIC.

**{25}**   In other words, if we held that Section 31-9-1.6 did not preclude the possibility of criminal commitment under the NMMIC for *all* defendants incompetent due to mental retardation, we would be leaving the defendants incompetent due to mental retardation who are accused of lesser crimes, and are thus more deserving, subject to criminal commitment

7

while those accused of greater crimes would be automatically civilly committed per the plain language of Section 31-9-1.6. While this approach may represent the most straightforward and mechanical application of the words of Section 31-9-1.6, we are doubtful whether this contradiction captures the intention of the Legislature. Rather, it is a result that is "absurd, unreasonable, [and] contrary to the spirit of [Section 31-9-1.6]." *See Smith*, 2004-NMSC-032, ¶ 10. Therefore, we conclude that, in this case, the failure of Section 31-9-1.6 to explicitly require that Defendant be civilly committed is not conclusive of the Legislature's intent on the point.

### 3. The 1999 Deletion to Section 31-9-1.6 Did Not Negate the State's Authority to Civilly Commit Defendant

**{26}** The State next argues that the 1999 amendment of Section 31-9-1.6 evinces the Legislature's intent to divest the State of the authority to civilly commit defendants that are dangerous, incompetent because of mental retardation, without a substantial probability of gaining competence, and accused of a crime other than the four enumerated in Section 31-9-1.6(C). However, when the 1999 amendment is considered not "in a vacuum," *see id.*, but in reference to the contemporaneous amendments to the NMMIC, it supports our conclusion that the Legislature did not intend to restrict the power of the State to civilly commit individuals like Defendant.

**{27}** The State belabors the 1999 deletion of the provision from Section 31-9-1.6 which read, "the [DOH] may commence proceedings pursuant to [the MHDDC] if the defendant was charged with any crime other than [the enumerated four]." *See* § 31-9-1.6(C) (1998). We agree that, when considered in the absence of the other contemporaneous amendments, the 1999 deletion appears to belie our conclusion that the State has the authority to civilly commit individuals like Defendant. However, during the same session in which the Legislature deleted this provision from Section 31-9-1.6(C), it added nearly identical language to Section 31-9-1.4(C). That section now provides that, where the district court determines that there is not a substantial probability of the defendant attaining competency and accordingly dismisses the charges, "[i]f the treatment supervisor has issued a report finding that the defendant satisfies the criteria for involuntary commitment contained in the [MHDDC], the [DOH] shall commence proceedings pursuant to [the MHDDC] . . . ." Section 31-9-1.4(C). Thus, when considered alongside the addition of language to Section 31-9-1.4(C), the Section 31-9-1.6 deletion is not dispositive of legislative intent and may only represent a housekeeping deletion of a provision the Legislature deemed superfluous.

**{28}** Apart from the addition of language to Section 31-9-1.4(C), our conclusion that the amendment to Section 31-9-1.6 was not intended to limit the State's authority to civilly commit defendants incompetent due to mental retardation is supported by the numerous references to that authority throughout the NMMIC and the MHDDC. For example, Section 31-9-1.4(C) has always contained a provision allowing the district court to refer the defendant to the district attorney for possible civil commitment in cases where the defendant is determined to be without a substantial probability of gaining competence and the charges

8

have been dismissed. Section 31-9-1.2(A) provides that, where the defendant is incompetent and not dangerous, the court may advise the district attorney to proceed with civil commitment. In Section 31-9-1.3(B)(3), the Legislature made reference to the fact that a treatment supervisor's report may include a finding as to whether the defendant satisfies the criteria for civil commitment under the MHDDC. Section 31-9-1.5(B), (C), and (D)(4)(b) all include civil commitment as an option available to the district court. Section 31-9-1.5(B) reads, "nothing in this section shall prevent the state from initiating proceedings under the provisions of the [MHDDC]." Finally, under the MHDDC, the district court may refer the defendant to the district attorney to consider civil commitment. Section 43-1-1(E). In light of the 1999 addition to Section 31-9-1.4(C), as well as the various other statutory references to the State's authority to civilly commit incompetent defendants, it cannot be said that the Legislature intended to restrict the State from civilly committing defendants that are dangerous, incompetent because of mental retardation, without a substantial probability of gaining competence, and accused of a crime other than the four enumerated in Section 31-9-1.6(C), in spite of the amendment to Section 31-9-1.6.

**4.      The State Has the Authority Under the MHDDC to Civilly Commit Defendant**

**{29}**     The State's third and fourth arguments are interconnected. It maintains that, because it has no authority to civilly commit Defendant per the terms of the MHDDC, without criminally committing Defendant, the public safety will be compromised. We conclude that the State's authority under the MHDDC remains undiminished and the public safety is therefore not at issue.

**{30}**     The State contends that it has no authority under the MHDDC to initiate civil commitment proceedings against Defendant because only a guardian may commit an individual with mental retardation to habilitation under that statute. *See* § 43-1-3(H) (classifying mental retardation as a developmental disability); § 43-1-13(A) (establishing that the commitment of developmentally disabled adults to residential habilitation shall be by petition of a guardian). While it is true that only guardians may commit those with mental retardation to habilitation under the MHDDC, habilitation is not at issue in the instant case; habilitation is altogether different from civil commitment. The MHDDC defines habilitation as:

> the process by which professional persons and their staff assist the developmentally disabled client in acquiring and maintaining those skills and behaviors that enable the person to cope more effectively with the demands of the person's self and environment and to raise the level of the person's physical, mental and social efficiency.

Section 43-1-3(L). Habilitation is akin to the teaching of basic life skills. *Youngberg v. Romeo*, 457 U.S. 307, 309 n.1 (1982).

**{31}**     Contrary to habilitation, civil commitment is purposed not just on the betterment of

9

the individual, but on the public safety. Because there is a public interest in civilly committing dangerous individuals, the right to initiate the process is not as limited as with habilitation. The MHDDC clearly states that "[a]fter an evaluation and upon reasonable notice, the district court may commit a dangerous defendant charged with a felony pursuant to [the NMMIC] or may dismiss the charges without prejudice and refer the defendant to the district attorney for possible initiation of proceedings under [the MHDDC]." Section 43-1-1(E).

**{32}** In arguing about habilitation, the State apparently misapprehends the fact that Defendant is subject to civil commitment for his dangerousness, not his mental retardation. *See id.* The power of the State to civilly commit Defendant has its origin in the police power, the authority to provide the citizenry with a safe community in which to reside. *See State v. Rotherham*, 122 N.M. 246, 262, 923 P.2d 1131, 1147 (1996) (recognizing that the State has a compelling interest in committing dangerous incompetent defendants); *see also* § 43-1-12(C) ("If . . . the factfinder determines by clear and convincing evidence that *the client presents a likelihood of harm to himself or others*, that extended treatment is likely to improve the client's condition and that the proposed . . . commitment is consistent with the least drastic means principle, the court shall order commitment . . . .") (emphasis added). A dangerous incompetent defendant may be detained by the State without regard to the circumstance that makes him or her incompetent, whether it be mental retardation or any other disability or illness.

**{33}** The State's authority—and responsibility—to protect society from dangerous individuals under the MHDDC is unaffected by the Legislature's statement in Section 31-9-1.6 as to the manner in which those individuals should be detained. Further, society is equally protected from the danger of individuals like Defendant whether they are civilly or criminally committed. The State's third and fourth arguments are therefore without merit.

## 5. Precluding Defendant From Being Criminally Committed is Sound Policy

**{34}** Construing Section 31-9-1.6 as an expression of legislative intent that individuals that are dangerous, incompetent due to mental retardation, and without a substantial probability of gaining competence no longer be subject to criminal commitment under the NMMIC and instead only be civilly committed is consistent with the distinction between mental retardation and mental illness and society's evolving understanding of the nature of mental retardation.

**{35}** The distinction between mental retardation and mental illness has long been incorporated into the Anglo-American legal system: differing treatment of "idiots" and "lunatics" is seen at least as far back as the thirteenth century. James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 416 (1985). Mental retardation is not a mental illness. *Id.* at 423. While "[m]entally ill people

10

encounter disturbances in their thought processes and emotions[,] mentally retarded people have limited abilities to learn." *Id.* at 424. Another distinction is that mental retardation is largely immutable while mental illness is often episodic. *Id.* The practical significance of the permanence of mental retardation is that defendants incompetent due to mental retardation are less likely to be treated to competency than those incompetent due to mental illness, though there are cases where those with mild mental retardation may be treated to competency. Because mental retardation is inherently different than mental illness, the Legislature made a sound policy decision when it created a distinct mechanism for defendants incompetent due to mental retardation.

**{36}** Society's understanding of mental retardation and its effect on criminal culpability is evolving. When the United States Supreme Court first addressed mental retardation in 1927, it did so in the context of rejecting equal protection and due process challenges to the involuntary sterilization of a woman with mental retardation. *See Buck v. Bell*, 274 U.S. 200, 205 (1927). The language in *Buck* is striking for its contempt of those with mental retardation, as well as its presumption of their criminality: "[i]t is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind." *Id.* at 207.

**{37}** Since the time of *Buck*, the treatment of individuals with mental retardation by the legal system has demonstrated a maturing understanding of the disability and a concomitant recognition of the diminished culpability of criminal defendants with mental retardation. For example, in the landmark case of *Atkins v. Virginia*, the United States Supreme Court held that executing defendants with mental retardation violated the Eighth Amendment prohibition against cruel and unusual punishment. 536 U.S. 304, 321 (2002); *see also* NMSA 1978, § 31-20A-2.1(B) (1991) ("The penalty of death shall not be imposed on any person who is mentally retarded."); *State v. Flores*, 2004-NMSC-021, 135 N.M. 759, 93 P.3d 1264 (outlining the procedure by which to best effectuate Section 31-20A-2.1). The *Atkins* Court critically recognized that, "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses, . . . [individuals with mental retardation] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Atkins*, 536 U.S. at 306. It quoted with approval the dissenting opinion of the lower court: "it is indefensible to conclude that individuals who are mentally retarded are not to some degree less culpable for their criminal acts. By definition, such individuals have substantial limitations not shared by the general population." *Id.* at 310.

**{38}** Commentators and experts agree that "the presence of mental retardation creates substantive differences in causation [and] culpability . . . . " John J. McGee & Frank J. Menolascino, *The Evaluation of Defendants with Mental Retardation in the Criminal Justice System*, *in* The Criminal Justice System and Mental Retardation 55, 55 (Ronald W. Conley ed., 1991). In this light, Section 31-9-1.6's requirement that Defendant be civilly and not criminally committed is a sound policy decision that reflects both the distinction between mental retardation and mental illness and the modern understanding of mental retardation.

11

Section 31-9-1.6 is an incorporation of the "evolving standards of decency that mark the progress of a maturing society." *Atkins*, 536 U.S. at 312.

**{39}** As a final point, we wish to address the fact that Section 31-9-1.6 is, by itself, not a comprehensive legislative scheme. It is critical that, where Section 31-9-1.6 is silent, the previously applicable law, the NMMIC, applies. For example, before the procedures envisaged by Section 31-9-1.6 may be executed, it is necessary to first proceed through the mechanism of Sections 31-9-1.1 to -1.3 to allow for, *inter alia*, an evaluation, a hearing, a determination of competency, and an inquiry into whether there is a substantial probability of attaining competency. This procedure is the optimal mechanism for treating the NMMIC and Section 31-9-1.6 as harmonious instead of contradictory. *See Muniz*, 2003-NMSC-021, ¶ 14. Our Opinion shall not be read to reduce the procedural protections available to defendants incompetent due to mental retardation to fewer than what is guaranteed those defendants incompetent for other reasons. Our holding is limited to the conclusion that Section 31-9-1.6 was intended to preclude the criminal commitment of defendants that are dangerous, incompetent due to mental retardation, without a substantial probability of gaining competence, and accused of a crime other than those listed in Section 31-9-1.6(C).

**III.    Conclusion**

**{40}** For all of the above reasons, we conclude that Defendant has mental retardation under New Mexico law and that he may not be criminally committed but may be civilly committed.

**{41}    IT IS SO ORDERED.**

 

 

**PATRICIO M. SERNA, Justice**

**WE CONCUR:**

**EDWARD L. CHÁVEZ, Chief Justice**

**PETRA JIMENEZ MAES, Justice**

**RICHARD C. BOSSON, Justice**

**CHARLES W. DANIELS, Justice**

12

**Topic Index for *STATE V. TRUJILLO*, No. 30,318**

**Criminal Procedure**
CA-CS:      Competency to Stand Trial

**Mental Competency**
MC-MI:      Mental Illness and Competency Statutes

**Statutes**
ST-IP:      Statutory Interpretation