# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2020-NMCA-044**

**Filing Date: June 16, 2020**

**No. A-1-CA-37477**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellant,

v.

**GREGORY MARVIN HOBBS,**

     Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF CHAVES COUNTY**
**Freddie J. Romero, District Judge**

Certiorari Granted, September 8, 2020, No. S-1-SC-38437; Cross-Petition Granted, No. S-1-SC-38437. Released for Publication October 6, 2020.

Hector H. Balderas, Attorney General
Santa Fe, NM
Lauren J. Wolongevicz, Assistant Attorney General
Albuquerque, NM

for Appellant

New Mexico Innocence and Justice Project
University of New Mexico School of Law
Barbara Creel, Supervising Attorney
Albuquerque, NM

for Appellee

## OPINION

**BOGARDUS, Judge.**

**{1}** The State appeals the district court's order granting Defendant Gregory Martin Hobbs' motion for new trial pursuant to Subsection H of the Procedures for Post-Conviction Consideration of DNA Evidence statute, NMSA 1978, Section 31-1A-2 (2005, amended 2019). This appeal requires us to interpret, as a matter of first

impression, the standard for granting relief under Section 31-1A-2(H).[1] We hold DNA evidence is "exculpatory" as used in Section 31-1A-2(H)—that is, it reasonably tends to negate the petitioner's guilt—when it (1) is material; (2) is not merely cumulative; (3) is not merely impeaching or contradictory; and (4) raises a reasonable probability that the petitioner would not have pled guilty or been found guilty had the DNA testing been performed prior to the conviction. We reverse the district court's grant of a new trial and remand for further consideration in light of the standard we announce in this opinion.

## BACKGROUND

### I. Defendant's Trial and Direct Appeal

{2} During an altercation on June 15, 2012, Defendant shot and killed Ruben Archuleta, Jr. and Ruben Archuleta, Sr. Concluding that Defendant was legally justified in shooting Ruben Jr., the State did not prosecute Defendant for Ruben Jr.'s death. The State prosecuted Defendant for voluntary manslaughter, contrary to NMSA 1978, Section 30-2-3(A) (1994), in relation to Ruben Sr.'s death.

{3} At trial, Defendant argued that he shot Ruben Sr. in self-defense. Specifically, Defendant testified to the following: After he had shot Ruben Jr., Ruben Sr. grabbed either his hand or the gun. Defendant began backing up, attempting to get away, but Ruben Sr. grabbed him again. Defendant thought that Ruben Sr. was going to take the gun away from him and use it against him. Defendant began to fire at Ruben Sr., and they were so close that Defendant felt Ruben Sr.'s blood fall onto his hands from having been shot. Defendant continued to fire until he was out of ammunition; Ruben Sr. continued to struggle with Defendant until the last shot. Defendant was afraid during the fight and believed that he was protecting his own life when he shot Ruben Sr.

{4} The jury also received the following evidence that could reasonably support his theory of self-defense: When interviewed on the night of the incident, Teresa Archuleta—Ruben Jr.'s wife—told police that Defendant and Ruben Sr. were wrestling before Ruben Sr. was shot. Teresa also testified that Defendant and Ruben Sr. were really close together before the shooting. Another witness testified that Defendant and Ruben Sr. were wrestling with each other and it appeared that Ruben Sr. was trying to get the gun from Defendant. Dr. Andrews, from the Office of the Medical Examiner, opined that the gunshot wound to the left side of Ruben Sr.'s chest was the result of a shot fired from six to eight inches away. Dr. Andrews further testified Ruben Sr.'s shirt had to have been pulled down to line up a gunshot defect on the shirt with the bullet wound to his left chest.

{5} During closing argument, the State questioned Defendant's theory of self-defense by asking the jury to consider whether Defendant's actions were reasonable and whether there were facts that supported the immediate appearance of great bodily

---

[1]The district court's ruling and the parties' arguments are based on the 2005 amendment of Section 31-1A-2, which was in effect in 2015 when Defendant filed his petition for post-conviction DNA testing under that statute. Accordingly, this opinion also applies the 2005 amendment.

harm or death. Specifically, the State noted that Ruben Sr. was unarmed and argued that the condition of Defendant's t-shirt, which had been admitted into evidence, was inconsistent with Defendant's description of a struggle for life and death. Defendant requested, and the jury was instructed on, his theory of self-defense.

**{6}** The jury rejected Defendant's self-defense theory, found Defendant guilty of voluntary manslaughter, and also found that Defendant used a firearm in the commission of that crime, contrary to NMSA 1978, Section 31-18-16(A) (1993). Defendant was sentenced to a seven-year term of incarceration.

**{7}** Defendant appealed and advanced three arguments: (1) his "right to a public trial was violated," (2) he "received ineffective assistance of counsel," and (3) "the district court erred in denying [his] request for new trial." *State v. Hobbs*, 2016-NMCA-006, ¶ 1, 363 P.3d 1259, *cert. denied*, 2015-NMCERT-___ (No. S-1-SC-35584, Dec. 7, 2015). Defendant did not challenge whether sufficient evidence supported the jury's finding that he did not act in self-defense. Ultimately, this Court affirmed Defendant's conviction, *id.* ¶ 37, and our Supreme Court denied certiorari.

## II.    The Proceedings Pursuant to Section 31-1A-2

**{8}** In August 2015, while his appeal was pending, Defendant filed a petition for post-conviction DNA testing pursuant to Section 31-1A-2(A). Defendant sought (1) DNA testing on the handgun he used to shoot Ruben Sr. as well as the t-shirt Defendant was wearing on the night of the shooting; and (2) the release of Ruben Sr.'s FTA blood card for comparison purposes. As required by Section 31-1A-2(B), Defendant agreed to submit to DNA testing and authorized the district attorney's use of the DNA test results to investigate all aspects of the case.

**{9}** At a hearing on Defendant's petition, the State did not oppose the requested testing but did not concede that any result therefrom would entitle Defendant to a new trial or call into question the jury's verdict. Following the hearing, the district court granted Defendant's petition; ordered that all relevant evidence that could be subjected to DNA testing be secured and preserved, in accordance with Section 31-1A-2(F); and further ordered DNA testing of the handgun and Defendant's t-shirt, pursuant to Section 31-1A-2(G) (requiring that the district court "order DNA testing if the petitioner satisfies the requirements set forth in Subsections B and C" of the statute).

**{10}** After DNA testing was complete, Defendant moved to vacate his conviction or, in the alternative, for a new trial. Defendant argued that the DNA testing results were exculpatory and he was therefore entitled to relief under Section 31-1A-2(H), which provides that "[i]f the results of the DNA testing are exculpatory, the district court may set aside the petitioner's judgment and sentence, may dismiss the charges against the petitioner with prejudice, may grant the petitioner a new trial or may order other appropriate relief." Defendant acknowledged that our Legislature did not define "exculpatory" and argued for a plain language analysis. *See Buzbee v. Donnelly*, 1981-NMSC-097, ¶ 45, 96 N.M. 692, 634 P.2d 1244 ("Exculpatory evidence is evidence

reasonably tending to negate guilt." (internal quotation marks and citation omitted)). Specifically, Defendant asserted that "[t]he DNA test results in this case are exculpatory because the test results are favorable to [him]" because "they corroborate his self-defense claim and counter the State's argument that [Ruben Sr.'s] behavior did not present an appearance of death or great bodily harm to [Defendant]."

**{11}**   In response to Defendant's motion, the State argued that the "DNA test results are not exculpatory and d[id] not create any factual dispute as to the evidence presented at trial." The State also argued that Defendant's "claim is best reviewed through a claim of ineffective assistance of counsel" because the handgun and t-shirt were available for forensic testing before trial. Furthermore, the State noted that Defendant had pointed to the lack of forensic testing on the t-shirt and handgun at trial as evidence that the Roswell Police Department did not adequately investigate whether Defendant acted in self-defense.

**{12}**   Defendant replied that if the DNA testing evidence had been available at trial, there is a reasonable probability that the jury would have found that Defendant acted reasonably and in self-defense because it "supports the testimony of a struggle over the gun, that [Defendant] was subjectively reasonable in his perception of an immediate threat of death or great bodily harm, and that he had reason to be in fear for his life." Defendant also disputed that trial counsel's effectiveness was at issue in his request for relief.

**{13}**   At the hearing on Defendant's motion, the district court received testimony from Eve Tokumaru, a forensic scientist with the New Mexico Department of Public Safety Forensic Laboratory who was qualified as an expert in DNA analysis. Ms. Tokumaru testified that she was able to compare DNA mixtures from both the ejection port of the handgun and the t-shirt to the known samples for Ruben Sr. and Defendant. Ms. Tokumaru believed that the DNA mixtures came from touch DNA, which she defined as DNA that was not left behind in a biological fluid like blood or saliva. Ms. Tokumaru acknowledged that touch DNA can be the result of a secondary transfer, wherein a person's DNA is deposited on an item by someone other than that person.

**{14}**   Ms. Tokumaru testified that Ruben Sr. could not be eliminated as a possible contributor to either mixture. However, Ms. Tokumaru could not say that there was a greater than fifty-percent probability that Ruben Sr.'s DNA was on the ejection port or the t-shirt. Defendant was eliminated as a contributor to the DNA mixture found on the ejection port but was a major contributor to the DNA found on the t-shirt.

**{15}**   After the evidence was presented at the hearing, the district court discussed its proposed analysis, which involved consideration of the following four questions: (1) whether the evidence is new; (2) whether the evidence is admissible; (3) whether the evidence is exculpatory; and (4) whether there was a reasonable probability that the evidence, if presented at trial, would have resulted in Defendant not being found guilty. In response to the district court's proposed analysis, Defendant argued that Section 31-1A-2 did not require that the evidence be new in order to receive post-testing relief.

Ultimately, the district court requested briefing from the parties on whether the DNA evidence testified to by Ms. Tokumaru would be admissible and whether the evidence was exculpatory.

**{16}**  In its briefing, the State conceded that the evidence presented by Ms. Tokumaru would be admissible at trial but argued that the results of the DNA testing were not exculpatory. Specifically, the State argued that (1) the evidence was cumulative; (2) secondary transfer could explain why DNA consistent with Ruben Sr.'s was found on the handgun's ejection port; and (3) there were other explanations for why DNA consistent with Ruben Sr.'s was found on the handgun's ejection port—for example, Ruben Sr. could have touched the gun inadvertently or in an effort to push it away. Defendant argued that the results of the DNA testing were exculpatory. Defendant contended that, because the DNA evidence was physical evidence that could support an inference that Ruben Sr. grabbed the handgun, the State would not have been able to prove that Defendant did not act in self-defense. Defendant again argued that there is no language in Section 31-1A-2 that requires the evidence to be new or newly discovered.

**{17}**  The district court entered findings of fact and conclusions of law, wherein it denied Defendant's motion to vacate his conviction or, in the alternative, for a new trial. The district court explained that it could not conclude that the evidence was exculpatory, noting that Ms. Tokumaru could not say that there was a greater than fifty-percent probability that Ruben Sr.'s DNA was present on the t-shirt or the handgun's ejection port. The district court further explained that, even if the evidence was exculpatory, it could not conclude that there was a reasonable probability that Defendant would not have been found guilty even if the DNA evidence was presented at trial because the evidence did not contradict the State's theory that Defendant did not suffer any physical injuries.

**{18}**  Defendant then filed a motion to reconsider, requesting that the Court reopen the record "for submission of additional evidence addressing the interpretation of the complex DNA mixtures" found on the tested items. Defendant noted that the raw data from the DNA testing performed by Ms. Tokumaru had already been submitted for probabilistic genotyping, which is a statistical method that uses Markov Chain Monte Carlo (MCMC) methods to infer genotypes that may have contributed to a DNA sample and then assigns a probability to the inferred genotypes. The State responded that Defendant's motion did not advance any new argument regarding the DNA results being exculpatory and therefore contended it should be denied.

**{19}**  A hearing was held on Defendant's motion to reconsider. At the hearing, the district court received testimony from Ms. Tokumaru and Dr. Greg Hampikian, a professor of biology at Boise State University whose research included the development of new forensic technology and analysis of complex DNA mixtures. Both were admitted as experts. Ms. Tokumaru's testimony was consistent with her testimony at the first hearing. Ms. Tokumaru noted that although the Department of Public Safety Forensic Laboratory did not conduct probabilistic genotyping at the time, there were a number of

other laboratories that have employed and validated that method. Dr. Hampikian testified that Cybergenetics used a software product called "True Allele" to subject the raw data that was produced by Ms. Tokumaru to probabilistic genotyping. Dr. Hampikian testified that the probabilistic genotyping process takes into account more of the data than the process employed by Ms. Tokumaru, including consideration of data that is below Ms. Tokumaru's laboratory's analytical threshold and consideration of the relative peak heights to a much greater degree. Regarding the DNA mixture found on the handgun's ejection port, Dr. Hampikian testified that although he could not say that Ruben Sr.'s DNA was present, he could say that based on the probabilistic genotyping in this case, assuming that the sample was a three-person mixture, the likelihood that a random person contributed to this three-person mixture as opposed to Ruben Sr. was 1 in 10,000,000.

**{20}**    Following the hearing, the district court issued a written order granting Defendant's motion to reconsider. In its order, the district court noted that the evidence presented by Ms. Tokumaru would be admissible and that it was "highly likely" that the evidence presented by Dr. Hampikian would also be admissible with proper foundation and sponsoring witnesses. While the order also noted that it was a "close case" on whether Defendant met the standard for a new trial set forth in Section 31-1A-2(H), the district court ultimately granted the new trial after "conclud[ing] that the evidence is probative to Defendant's claim of self[-]defense and could be exculpatory."[2] The State appealed.

## DISCUSSION

**{21}**    The State advances four arguments in this appeal: (1) the district court erred by failing to follow the procedures governing the consideration of post-conviction DNA testing as set forth in Section 31-1A-2; (2) the district court erred by granting Defendant a new trial without first finding that the DNA evidence was exculpatory; (3) the district court erred in concluding that the probabilistic genotype DNA evidence would be admissible; and (4) the district court abused its discretion in granting Defendant a new trial. We need only address the State's fourth argument because it is dispositive of this appeal.

I.    **We Reverse the District Court's Grant of a New Trial and Remand for Reconsideration in Light of the Standard We Announce in This Opinion**

**{22}**    This appeal presents the first opportunity for New Mexico's appellate courts to construe Section 31-1A-2, which governs the procedures for post-conviction consideration of DNA evidence. We are not tasked with examining the requirements for a petitioner to obtain testing, *see* Section 31-1A-2(G), because the State did not contest Defendant's testing request. Instead, our task in this case is to analyze Section 31-1A-

---

2As we previously mentioned, the district court entered findings of facts and conclusions of law when it initially denied Defendant's motion to vacate his conviction or, in the alternative, for a new trial. When the district court subsequently granted Defendant a new trial, it did not enter findings of fact and conclusions of law. Instead, it provided the explanation that we have summarized in this paragraph.

2(H), which governs whether a petitioner is entitled to a remedy after post-conviction DNA testing has been completed.

**{23}** To determine whether Defendant is entitled to a remedy under Section 31-1A-2(H), the State urges us to adopt the six requirements on which courts rely when considering a motion for new trial on the grounds of newly discovered evidence. *See* Rule 5-614(C) NMRA (governing motions for new trial on the grounds of newly discovered evidence); *State v. Garcia*, 2005-NMSC-038, ¶ 8, 138 N.M. 659, 125 P.3d 638 (identifying the six requirements for the grant of a new trial on the grounds of newly discovered evidence). Applying those requirements to the facts of this case, the State argues that the district court abused its discretion in granting Defendant a new trial. Expressing no disagreement with the State that those six requirements are relevant in this context, Defendant likewise analyzes the district court's grant of his motion for new trial under that framework but argues that the district court did not abuse its discretion. Nevertheless, the parties' agreement on the analytical framework does not compel us to adopt it. Therefore, we take this opportunity to independently analyze the meaning of "exculpatory" as used in Section 31-1A-2(H).

## A.      Standard of Review

**{24}** Typically, "we review the district court's grant of a new trial for clear and unmistakable abuse of discretion." *State v. Acosta*, 2016-NMCA-003, ¶ 15, 363 P.3d 1240 (internal quotation marks and citation omitted). However, this appeal requires us to interpret Section 31-1A-2, which "is a question that this Court reviews de novo." *State v. Martinez*, 2006-NMCA-068, ¶ 5, 139 N.M. 741, 137 P.3d 1195. "In interpreting a statute, our primary objective is to give effect to the Legislature's intent." *State v. Trujillo*, 2009-NMSC-012, ¶ 11, 146 N.M. 14, 206 P.3d 125. "We do this by giving effect to the plain meaning of the words of [the] statute, unless this leads to an absurd or unreasonable result." *State v. Marshall*, 2004-NMCA-104, ¶ 7, 136 N.M. 240, 96 P.3d 801. "[I]n applying the plain meaning rule, this Court must exercise caution because its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate . . . differences of opinion concerning the statute's meaning." *Martinez*, 2006-NMCA-068, ¶ 5 (alteration, internal quotation marks, and citation omitted).

## B.      Review of Legislative Enactments Governing Post-Conviction DNA Testing in the United States Demonstrates That Section 31-1A-2 Is Unique

**{25}** New Mexico is not alone in allowing a convicted person access to evidence for post-conviction DNA testing. Indeed, all fifty states and the District of Columbia have adopted a statute or an act that allows for post-conviction DNA testing. *See* Innocence Project, *Access to Post-Conviction DNA Testing*, https://www.innocenceproject.org/causes/access-post-conviction-dna-testing/ (last visited June 3, 2020) (stating that "all [fifty] states have post-conviction DNA testing access statutes"); D.C. Code Ann. §§ 22-4131 to -4135 (West 2002, as amended

through 2013). Having reviewed each of these statutes or acts, we can say that none are identical to Section 31-1A-2.

{26}    Some of the statutes and acts are distinguishable from our post-conviction DNA testing statute because they clearly and unmistakably require that DNA testing demonstrate a petitioner's factual innocence before any post-testing remedy is granted. *See, e.g.*, Ala. Code § 15-18-200(h)(2) (2009) ("If the DNA testing conducted under this section produces conclusive evidence of the petitioner's factual innocence of the offense convicted, the petitioner, during a 60-day period beginning on the date on which the petitioner is notified of the test results, may file a petition to the circuit court that ordered the testing for post-conviction relief pursuant to Rule 32.1 of the Alabama Rules of Criminal Procedure."). Others are distinguishable because they require only that the DNA testing be favorable to a petitioner. *See, e.g.*, Ind. Code Ann. § 35-38-7-19 (West 2001) ("Notwithstanding any law that would bar a trial as untimely, if the results of post[-]conviction DNA testing and analysis are favorable to the person who was convicted of the offense, the court shall order any of the following: (1) Upon motion of the prosecuting attorney and good cause shown, order retesting of the identified biological material and stay the petitioner's motion for a new trial pending the results of the DNA retesting[;] (2)Upon joint petition of the prosecuting attorney and the petitioner, order the release of the person[;] (3) Order a new trial or any other relief as may be appropriate under Indiana law or court rule.").

{27}    In our review, we were only able to identify six other states that use the word "exculpatory," as does Section 31-1A-2(H), when evaluating whether to grant post-testing relief. *See State v. Gutierrez*, 278 P.3d 1276, 1280 (Ariz. 2012) (En Banc) (requiring Arizona's district courts to order a hearing when the DNA results "completely and indisputably exonerate the defendant" as well as when the "results are favorable but not necessarily or completely exculpatory"); *People v. Starks*, 850 N.E.2d 206, 212 (Ill. App. Ct. 2006) (stating that "[i]f the results are neither truly exculpatory nor inculpatory, . . . this may provide a basis for a defendant to file a post[-]conviction petition asserting a claim of actual innocence based on newly discovered evidence[,]" and "[s]uch evidence of actual innocence has to be so conclusive that it would probably change the result on retrial" (internal quotation marks and citation omitted)); Neb. Rev. Stat. Ann. § 29-4119 (2001) (defining "exculpatory evidence" as used in its DNA Testing Act as "evidence which is favorable to the person in custody and material to the issue of the guilt of the person in custody"); Or. Rev. Stat. Ann. § 138.696(2) (West 2020) (stating that if the DNA testing "produces exculpatory evidence, the person who requested the testing may file . . . a motion for a new trial based on newly discovered evidence"); 42 Pa. Cons. Stat. Ann. § 9543.1(f)(3) (West 2018) (providing that "the court shall determine whether the exculpatory evidence resulting from the DNA testing conducted under this section would have changed the outcome of the trial as required by section 9543(a)(2)(vi)"); S.C. Code Ann. § 17-28-100(B) (2009) (providing that "[i]f the results of the DNA test are exculpatory, the applicant may use the exculpatory results of the DNA test as grounds for filing a motion for new trial pursuant to the South Carolina Rules of Criminal Procedure"). However, of those six states, it appears that only the Oregon Court of Appeals has had the opportunity to construe "exculpatory" in

the post-testing relief context, and it declined to do so when it concluded the defendant was not eligible for relief even under the definition the defendant proposed. *See State v. Nefstad*, 456 P.3d 294, 297 (Or. Ct. App. 2019).

**{28}** Because the statutes and acts from other states are either distinguishable from Section 31-1A-2 or have not been interpreted by those state's respective appellate courts, they are unhelpful to our analysis.[3] Against this background, we therefore proceed to analyze the words chosen by our Legislature in Section 31-1A-2 under our rules of statutory interpretation.

**C.    DNA Evidence Is Exculpatory When It Reasonably Tends to Negate the Petitioner's Guilt**

**{29}** As we previously mentioned, Section 31-1A-2(H) provides that "[i]f the results of the DNA testing are exculpatory, the district court may set aside the petitioner's judgment and sentence, may dismiss the charges against the petitioner with prejudice, may grant the petitioner a new trial or may order other appropriate relief." Notably, our Legislature did not define "exculpatory" as used in Section 31-1A-2(H).

**{30}** Our Supreme Court has recognized that "[e]xculpatory evidence is evidence reasonably tending to negate guilt." *Buzbee*, 1981-NMSC-097, ¶ 45 (internal quotation marks and citation omitted). This definition is consistent with dictionary definitions of "exculpatory evidence." *See Griego v. Oliver*, 2014-NMSC-003, ¶ 21, 316 P.3d 865 ("Under the rules of statutory construction, we first turn to the plain meaning of the words at issue, often using the dictionary for guidance." (internal quotation marks and citation omitted)). For example, *Black's Law Dictionary* defines "exculpatory evidence" as "[e]vidence tending to establish a criminal defendant's innocence." *Evidence*, Black's Law Dictionary (11 ed. 2019). Similarly, *Merriam-Webster* defines "exculpatory evidence" as "evidence that tends to clear a defendant from fault or guilt." https://www.merriam-webster.com/dictionary/evidence#legalDictionary (last visited June 15, 2020).

**{31}** Importantly, all of the foregoing definitions, including the one recognized by our Supreme Court, use a variation of the verb phrase "tends to" when discussing the required effect of the DNA evidence on a defendant's guilt. Nevertheless, the State relies on the language of Section 31-1A-2(A) to support its contention that Defendant had the burden to show that the DNA evidence will exculpate him or, in other words, prove his innocence. *See State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939 (stating that "a statutory subsection may not be considered in a vacuum, but must be considered in reference to the statute as a whole and in reference to statutes

---

3We also note that New Mexico's previous statute governing post-conviction DNA testing, repealed with the enactment of Section 31-1A-2, focused on the requirements for post-conviction DNA testing without identifying the standard necessary to obtain post-testing relief. *See* NMSA 1978, § 31-1A-1 (2001, repealed 2003). Accordingly, it is also not helpful to our analysis.

dealing with the same general subject matter" (internal quotation marks and citation omitted)).

**{32}**    In relevant part, Section 31-1A-2(A) provides that "[a] person convicted of a felony, *who claims that DNA evidence will establish his innocence*, may petition the district court of the judicial district in which he was convicted to order the disclosure, preservation, production and testing of evidence that can be subjected to DNA testing." (Emphasis added.) This language cannot be interpreted, as the state suggests, to require the petitioner to establish that DNA evidence will prove him innocent. Instead, Section 31-1A-2(A) simply identifies the class of defendants who may petition the district court—those convicted of a felony and claiming that DNA evidence will establish their innocence. Accordingly, we decline the State's invitation to adopt a definition that is inconsistent with the words chosen by our Legislature when identifying the petitioner's burden.

**{33}**    Instead, our determination in this case is guided by a plain language analysis of the statute's actual wording as chosen by our Legislature and our case law interpreting the same term in other contexts. Based on those considerations, we determine that post-conviction DNA evidence is "exculpatory" under Section 31-1A-2(H) when it reasonably tends to negate the petitioner's guilt.

## D.    The DNA Evidence Must Meet Four Requirements In Order to Be "Exculpatory"

**{34}**    Having defined "exculpatory" under Section 31-1A-2(H), we believe it necessary to provide the district courts of New Mexico with guidance on how to apply that definition. It is here that we address the applicability of the analytical framework that the parties employed in this appeal—i.e., the standard for granting a motion for new trial on the grounds of newly discovered evidence. A motion for new trial on the grounds of newly-discovered evidence is only to be granted when the newly-discovered evidence meets six requirements:

> 1) it will probably change the result if a new trial is granted; 2) it must have been discovered since the trial; 3) it could not have been discovered before the trial by the exercise of due diligence; 4) it must be material; 5) it must not be merely cumulative; and 6) it must not be merely impeaching or contradictory.

*Garcia*, 2005-NMSC-038, ¶ 8 (internal quotation marks and citation omitted).

**{35}**    As an initial matter, we note that Section 31-1A-2 contains no requirement that the evidence be newly discovered. In fact, the Legislature only required a defendant to prove that "the evidence to be subjected to DNA testing: (a) has not previously been subjected to DNA testing; (b) has not previously been subjected to the type of DNA testing that is now being requested; or (c) was previously subjected to DNA testing, but was tested incorrectly or interpreted incorrectly[,]" Section 31-1A-2(C)(3), choosing not

to include a requirement that the evidence must have been discovered since the trial. *See State v. Greenwood*, 2012-NMCA-017, ¶ 38, 271 P.3d 753 ("The Legislature knows how to include language in a statute if it so desires." (alteration, internal quotation marks, and citation omitted)). Further, the focus of Section 31-1A-2(H) is on whether the DNA evidence is exculpatory rather than on when the evidence could have been discovered. *Cf. Montoya v. Ulibarri*, 2007-NMSC-035, ¶ 32, 142 N.M. 89, 163 P.3d 476 (concluding that the requirements applicable to motions for a new trial on the grounds of newly-discovered evidence do not constrain examination of a freestanding claim of actual innocence because the focus "is on actual innocence rather than when the evidence could have been discovered or procedural error"). Accordingly, we are not persuaded that a conclusion that the DNA evidence is "exculpatory" under Section 31-1A-2(H) requires a showing that (1) the evidence has been discovered since trial and (2) could not have been discovered before the trial with due diligence; thus we decline to include these requirements into the analytical framework that we adopt in this case.

**{36}** As for the other requirements, we believe they are relevant, with some modification, to whether evidence is "exculpatory" under Section 31-1A-2(H). *Cf. Montoya*, 2007-NMSC-035, ¶ 32 (concluding that, while the requirements for a new trial on the grounds of newly-discovered evidence did not confine the inquiry, those requirements were relevant when reviewing whether the evidence was reliable). We explain.

**{37}** The New Mexico judiciary has an "interest in ensuring accuracy in criminal convictions in order to maintain credibility[.]" *Id.* ¶ 21. It is unassailable that criminal defendants have a fundamental interest in not being wrongly convicted. To protect these interests, Section 31-1A-2(H) allows a district court to grant appropriate relief when presented with exculpatory DNA evidence. When evaluating whether to grant relief under Section 31-1A-2(H), New Mexico courts must balance the foregoing interests with "the public's interest in the finality of a conviction obtained after a petitioner has been afforded all constitutional rights required by law[,]" *Montoya*, 2007-NMSC-035, ¶ 29, the victim's interest in the closure that finality brings, and the fact that the petitioner often[4] has previously challenged his conviction in a direct appeal. We believe that the adoption of the following four requirements strikes the necessary balance between these interests.

**{38}** First, the DNA evidence must be material to the petitioner's innocence such that it raises a reasonable probability that the petitioner would not have pled guilty or been found guilty at trial. *Cf. State v. Fero*, 1988-NMSC-053, ¶¶ 10, 13, 107 N.M. 369, 758 P.2d 783 (concluding that evidence is material only "if there is a reasonable probability that . . . the result of the proceeding would have been different" and applying the definition of materiality found in *United States v. Bagley*, 473 U.S. 667, 682 (1985), when reviewing the denial of a motion for new trial on the grounds of newly discovered evidence (internal quotation marks omitted)). "A reasonable probability is a probability

---

4We recognize that Section 31-1A-2 allows those who have pled guilty to petition for post-conviction DNA testing and to seek post-testing relief. Accordingly, we are mindful that those who have pled guilty may have waived their right to appeal as a condition of their plea.

sufficient to undermine confidence in the outcome." *Fero*, 1988-NMSC-053, ¶ 10 (internal quotation marks and citation omitted).

**{39}** Second, the DNA evidence must not be merely cumulative. Our Supreme Court has explained that the phrase "merely cumulative" contemplates "cumulative evidence the weight of which would probably be insufficient to turn the scales in [the] defendant's favor." *State v. Houston*, 1927-NMSC-024, ¶ 17, 33 N.M. 259, 263 P. 754 (internal quotation marks and citation omitted).

**{40}** Third, the DNA evidence must not be merely impeaching or contradictory. The DNA evidence, even if impeaching or contradictory, must corroborate a petitioner's claims to satisfy this requirement. *Cf. Garcia*, 2005-NMSC-038, ¶¶ 15-16.

**{41}** Fourth, the DNA evidence must raise a reasonable probability that the petitioner would not have pled guilty or been found guilty had the DNA testing been performed prior to the conviction. We adopt this language from Section 31-1A-2(C)(5) because it indicates that our Legislature expected that any exculpatory DNA evidence would have had that effect on the original proceeding. This requirement is similar to, but distinguishable from, the first requirement for a new trial on the grounds of newly-discovered evidence—that the evidence will probably change the result if a new trial is granted. *See Garcia*, 2005-NMSC-038, ¶ 8. The two requirements are similar because both require the district court to weigh the probable effect of the evidence. However, they are distinguishable because under Section 31-1A-2(H), the district court is to determine the DNA evidence's probable effect on the *original* proceeding whereas under a motion for new trial on the grounds of newly-discovered evidence, the district court is to determine the newly-discovered evidence's probable effect on a *new* trial. Importantly, the district court is in the best position to determine, in its discretion, whether the exculpatory DNA would have changed the result of the original proceeding. *Cf. State v. Shirley*, 1985-NMCA-120, ¶ 15, 103 N.M. 731, 713 P.2d 1 ("The question of whether the evidence produced in support of the motion [for a new trial on the grounds of newly discovered evidence] will probably change the result is one peculiarly addressed to the discretion of the [district] court.").

**{42}** In summary, we hold that DNA evidence is exculpatory under Section 31-1A-2(H)—that is, it reasonably tends to negate the petitioner's guilt—when it (1) is material; (2) is not merely cumulative; (3) is not merely impeaching or contradictory; and (4) raises a reasonable probability that the petitioner would not have pled guilty or been found guilty had the DNA testing been performed prior to the conviction. We believe that these requirements take into consideration the competing interests identified above and provide a uniform framework for district courts to employ when making such a determination.

**{43}** When granting or denying relief under Section 31-1A-2(H), the district court shall enter findings of fact and conclusions of law addressing each of the four requirements. This will provide clarity in the decision for the parties and assist in appellate review. When a district court concludes that any of the requirements are not met, it is proper for

the court to deny relief under Section 31-1A-2(H). *See Hill v. Burnworth*, 1973-NMCA-135, ¶ 8, 85 N.M. 615, 514 P.2d 1312 (stating that if the party moving for a new trial on the grounds of newly discovered evidence "fails to establish any of the six grounds, the motion is properly denied").

**{44}** While the district court entered written orders explaining its initial denial and subsequent grant of Defendant's motion for new trial, we cannot say that the foregoing requirements were fully considered such that we could evaluate the propriety of the district court's grant of the new trial in this appeal. Accordingly, we will not speculate on the conclusion the district court may have reached on each of these requirements. Instead, we remand to the district court for further consideration. On remand, the district court shall enter specific findings of fact and conclusions of law as to each requirement and thereby reach a conclusion as to whether relief is warranted under Section 31-1A-2(H).

**CONCLUSION**

**{45}** We reverse the district court's grant of a new trial and remand for further consideration in light of the standard announced in this opinion.

**{46}** **IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**JULIE J. VARGAS, Judge**